PER CURIAM.
Jerone Hunter appeals his convictions and sentences of death for first-degree murder. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm.
I. FACTUAL AND PROCEDURAL BACKGROUND
A. The Guilt Phase
On August 27, 2004, Hunter was charged in a fourteen-count superseding indictment relating to the murders of Erin Belanger, Roberto Gonzalez, Michelle Nathan, Anthony Vega, Jonathon Gleason, and Francisco Ayo-Roman. Hunter, with codefendants Troy Victorino and Michael Salas, went to trial on July 5, 2006. Code-fendant Anthony Cannon previously pled guilty as charged.
The evidence at trial established the following. On the morning of August 6, 2004, a coworker of two of the occupants of a residence on Telford Lane in Deltona, Florida, discovered the victims’ bodies. Belanger lived at the Telford residence with Ayo-Roman, Nathan, and Vega. Gonzalez and Gleason happened to be at the house the night of the murders. The six victims had been beaten to death with baseball bats and had sustained cuts to their throats, most of which were determined to have been inflicted postmortem. Belanger also sustained lacerations through her vagina up to the abdominal cavity of her body; the injuries were consistent with having been inflicted by a baseball bat. The medical examiner determined that some of the victims had defensive wounds. A dead Dachshund was also found in the house.
Following a call to 911, law enforcement officers responded to the scene. The front door had been kicked in, breaking a deadbolt lock and leaving a thirteen-inch shoe-print impression on the door. The victims were found throughout the house and blood was everywhere. A knife handle and knife blade were recovered at the scene, along with two playing cards with bloody shoe imprints, a bed sheet with footwear impressions, as well as a pay stub with a footwear impression.
Hunter, who at the time was eighteen years old and in twelfth grade, met code-fendant Cannon two months before the murders. He knew codefendant Salas from high school. Hunter met codefen-dant Victorino during the end of June or beginning of July of 2004, and moved in with Victorino a few days later. Together Hunter and Victorino lived in three different residences, including a house that be *1058 longed to victim Belanger’s grandmother. No one had permission to stay at Belan-ger’s grandmother’s house, but Victorino testified that the owner’s grandson had given him permission to stay there.
Approximately a week before the murders, Belanger contacted police concerning suspicious activity at her grandmother’s residence. Victorino also reported to police that he had items stolen from the same house. He became angry when the police told him he would have to provide a list of the stolen property. Victorino told the police he would take care of the matter himself. Victorino also met with Belanger at her residence, seeking return of his property.
Brandon Graham, who was living with codefendants Cannon and Salas, met Hunter and Victorino when they went to Belanger’s house on Telford Lane a few days before the murders so that Victorino could pick up his belongings. Victorino wanted them to fight the people at the residence. Hunter yelled for the occupants to come out and fight.
On the morning before the murders, Graham, Salas, and Cannon drove to the house where Hunter and Victorino were living. Victorino discussed a plan to beat everyone to death at the Telford residence, asking them if they “were down for it” and saying to Hunter, “I know you’re down for it” because he had belongings stolen as well. All agreed. Victorino verbally described the layout of the Telford house and who would go where. Hunter asked if they should wear masks; Victorino said no because they would kill all of the occupants.
A witness testified that around midnight on August 5, 2004, she saw Hunter, Salas, Cannon, and Victorino near the murder scene.[1] And Graham testified that the morning after the murders, he saw Victori-no’s belongings in the back of Cannon’s SUV. On the day after the murders, Victo-rino was arrested on a probation violation.
In his statement to police, Hunter said that he had gone in Cannon’s SUV to the house on Telford on late Saturday or early Sunday to get his belongings that had been taken from Belanger’s grandmother’s house. He had an aluminum baseball bat with him. Hunter said he entered the house through the front door and found Gleason in the recliner in the living room. Hunter screamed, “Where’s my stuff,” and when Gleason said, “I don’t know,” he hit him with the bat. Hunter hit Gleason because he thought he was lying. Gleason attempted to get up from the recliner and Hunter hit him again. Hunter said he hit Gleason more than three times but less than twelve. Hunter said he then went to look for his belongings. Hunter also indicated that he encountered victim Gonzalez in one of the bedrooms. He claimed he hit Gonzalez because Gonzalez had swung at him with a stick. After Gonzalez dropped his stick, Hunter continued to hit him, three to five more times. Hunter then continued looking for his belongings. Eventually, Hunter and his codefendants left in Cannon’s SUV. Hunter, who wore a black shirt, black shorts, and blue and white Nike tennis shoes during the incident, stated that he washed his clothes afterwards.
Cannon’s SUV was seized on August 7, 2004. Salas admitted to being at the Tel-ford residence the night of the murder and stated that Cannon had driven them there. Salas described what he had done while in the house and said the bats had been discarded at a retention pond. Based *1059 upon that information, law enforcement authorities recovered two bats from the pond and two bats from surrounding trees.
Salas testified about Hunter’s involvement in the murders. Salas explained that before the men entered the house on Tel-ford, Hunter called Salas and Cannon “bitches” because they did not want to take part in the plan. Hunter ran into the house after Victorino. Salas ran in next and saw Hunter swing his bat. Hunter said to Gleason, “I don’t like you” and started hitting him. Hunter asked Salas if he had killed Gonzalez; Hunter called Salas a “pussy boy” when Salas said he was not killing anyone. Hunter then ran into the bedroom and began hitting Gonzalez in the face and head. Hunter hit Gonzalez between twenty and thirty times, saying he had to kill him. Salas left the house. When Hunter came out he described how he found Nathan hiding in one of the bedrooms and killed her when she pled for her life. Salas described Hunter as having a look of “ferule [sic] joy.”
Pursuant to a search warrant, numerous items were taken from the house where Hunter and Victorino lived. Among the items taken was a pair of size thirteen boots, a pair of size ten and one-half Nike blue and white tennis shoes without shoe laces, and a pair of shoe laces. These shoes, the laces, and other physical evidence were admitted at trial linking Hunter, Salas, and Victorino to the murders.[2]
The jury returned its verdicts on July 25, 2006. It convicted Hunter of six counts of first-degree murder, three counts of abuse of a dead human body, and one count each of conspiracy to commit aggravated battery, murder, tampering with physical evidence, and armed burglary of a dwelling. The jury acquitted Hunter of *1060 the two counts of abuse of a dead human body with a weapon (postmortem cutting of throats or stabbing) and one count of cruelty to an animal.
B. The Penalty Phase
During the penalty phase, the State presented victim impact statements from family members of each of the victims. Hunter presented both lay and expert testimony. Family members testified that Hunter had a twin who had died as an infant and that Hunter had a history of talking out loud as though he were talking to his deceased sibling.
Dr. Alan Berns, a psychiatrist, testified to Hunter’s family’s history of mental illness, including schizophrenia and depression. Dr. Berns thought it likely that Hunter was schizophrenic and that it was unlikely that Hunter was malingering. Dr. Berns testified that schizophrenia can cause impairment of impulse control and judgment as well as an increased risk for violence.
Dr. Eric Mings, a neuropsychologist, also presented mental health testimony. While he did not find Hunter legally insane, Dr. Mings explained that Hunter had difficulty expressing his answers. Hunter’s full scale IQ score was 91. His profile was consistent with a person with a psychotic mental illness. Dr. Mings testified that Hunter was not functioning as a normal adult, and while he knew the difference between right and wrong, he was probably impaired in respect to conforming his conduct to the law. Dr. Mings also testified that Hunter reported hearing voices other than that of his deceased brother. During cross-examination, Dr. Mings acknowledged that it was two weeks before trial when Hunter reportedly started hearing other voices.
Dr. Ruben Gur, a psychologist with training in neuropsychology, also testified for the defense. Dr. Gur, having conducted “behavior imaging” through the use of a PET scan, concluded that Hunter had deficits in the left frontal temporal areas, which relate to memory and the ability to interpret the emotional relevance of information. Dr. Gur opined that Hunter was not malingering and that the pattern was similar to what is seen in individuals with schizophrenia. Dr. Gur concluded that Hunter had schizophreniform disorder, but his schizophrenia was not full-blown. According to Dr. Gur, Hunter’s brain has abnormal metabolism in twenty-three of thirty-five regions, including the entire limbic[3] system, which deals with memory and emotions. Further, Hunter is brain-damaged in the part of the brain that controls impulses and actions, and his left and right hemispheres do not communicate well. Therefore, Hunter would tend to be a follower. During cross-examination, Dr. Gur confirmed that Hunter was not far from graduating from high school, was in the forty-ninth percentile of his class, and had participated in team sports, and that the extent of his disciplinary record included leaving class early, horseplay, insubordination, disruption on campus, and battery on a student.
The State called one rebuttal witness, Dr. Lawrence Holder, a physician specializing in diagnostic radiology and nuclear medicine. He opined that Hunter’s PET scan was normal as was his MRI. Dr. Holder stated that the use of PET scans to diagnose psychiatric diseases is not an established use.
The jury recommended a death sentence for the murder of Gleason by a vote of ten to two, a death sentence for the murder of *1061 Gonzalez by a vote of nine to three, a death sentence for the murder of Nathan by a vote of ten to two, a death sentence for the murder of Vega by a vote of nine to three, and life sentences for the murders of Belanger and Ayo-Roman.
C. The Spencer Hearing and Sentencing
On August 28, 2006, a Spencer [4] hearing was held and the trial court imposed sentence on the noncapital convictions. Sentencing on the capital convictions was imposed on September 21, 2006. The trial court followed the jury’s recommendations and sentenced Hunter to death for the murders of Gleason, Gonzalez, Nathan, and Vega. In doing so, the trial court found the following five aggravating circumstances with their respective assigned weights: (1) the defendant has been previously convicted of another capital felony or felony involving the use or threat of violence to a person — very substantial weight; (2) the crime for which the defendant is to be sentenced was committed while he was engaged in the commission of the crime of burglary — moderate weight; (3) the crime for which the defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest — moderate weight; (4) the capital felony was especially heinous, atrocious, or cruel — very substantial weight; and (5) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification — great weight.
As for mitigation, the trial court found three statutory mitigating circumstances and assigned weights: (1) age of the defendant at the time of the crime — some weight; (2) the defendant acted under extreme duress or under the substantial domination of another person — some weight; (3) the defendant has no significant history of prior criminal activity— little weight. The trial court also found three nonstatutory mitigating circumstances: (1) the level of maturity of the defendant at the time of the crime — little weight; (2) the defendant exhibited good conduct during incarceration — very little weight; and (3) the defendant exhibited good conduct during trial — very little weight.
II. ISSUES RAISED ON APPEAL
Hunter raises numerous issues on appeal. As discussed below, none of his claims warrant relief.[5]
(A) Motion to Suppress Statements
Hunter argues that the trial court erred in denying his motion to suppress the statements he made to law enforcement officers. According to Hunter, he invoked his right to remain silent but officers continued to question him, and they also intentionally failed to advise him of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *1062 although he was a suspect at the time. Hunter further states that he reasonably believed he was not free to leave police custody based upon the manner in which he was brought to the police station, the accusatory statements made by officers to him, and the fact that questioning did not cease notwithstanding his pleas to remain silent. We disagree.
A hearing on Hunter’s motion was held on March 24, 2006. Hunter testified that the day he gave his statement, law enforcement officers came to the house where he had been staying and used a loudspeaker directing everyone to come outside with their hands raised. Hunter came out of the house, was told to put his hands on his head, and then was directed to sit on the sidewalk. Hunter testified that he did not feel free to walk away. During cross-examination, Hunter acknowledged that everyone who came out of the house was told to sit on the sidewalk and that no gun was pointed at them.
After Victorino was taken into custody, Hunter was approached by a plainclothes policeman and asked if he would go with the police to answer some questions. This inquiry was made after Hunter had been identified as an acquaintance of Victori-no’s. Hunter was not a “person of interest” at the time. Hunter admitted that he was told he did not have to go with police but testified that he did not feel like he could leave. Hunter was frisked and patted down before being put into an unmarked police car. One detective sat in the back seat with him, with his gun in plain view. Hunter fell asleep during the thirty-five to forty-minute drive.
Hunter testified that after his arrival at the sheriffs office he was told he was free to leave and that he was not under arrest. At no time did Hunter say he wanted to leave, and he admitted that he was told he could have a ride home. During redirect questioning, Hunter testified that he “may have” gone to speak to police on his own if he had his own car.
Hunter was interviewed by investigators for one hour and forty-three minutes prior to being read his rights under Miranda. Investigator Lawrence Horzepa testified that Hunter was given his Miranda rights when it was obvious that he was possibly involved based upon inconsistent answers and his demeanor, including that he was shaking and crying. Specifically, during the interview, Investigator Greg Seymour told Hunter he had caught him in some lies and that Hunter put himself with Vic-torino the night of the murders. The investigators questioned whether Hunter was involved and to what extent. In response to Seymour’s statement “If you had any level of involvement here, let’s just clear it now. Jump — jump on our side of the fence, man,” Hunter said, “That’s it.” In response to “You got to talk to me. You got to tell me what really happened,” Hunter stated, “I don’t have anything else to say.” Next, in response to “What’s Troy been telling you?,” Hunter said, “That’s it. That’s it.” Hunter denied knowing anything about what happened when asked and denied that Victorino had told him anything. In response to continued questioning, Hunter maintained that he did not have anything to do with the murders. When told that he needed to talk to Investigator Horzepa, Hunter replied, “That’s it.” Shortly thereafter, Hunter was read his Miranda rights.
The trial court, in denying Hunter’s motion, found the following. Hunter was not taken into custody when he, with others who had been in the same house, was detained a short time while a weapons cheek was done. In addition, Hunter voluntarily went with the detectives to the sheriffs office, and it appeared that the detectives used the only available vehicle in transporting Hunter. When testifying *1063 at the suppression hearing, Hunter’s recollection of the events was “vague, uncertain, and to many questions he was slow to respond as if he didn’t know what to say. On at least one occasion he looked to his lawyers for some help in terms of the answer.” The trial court further found that Hunter was not arrested, handcuffed, locked up or physically restrained, and was reminded several times that he could go home and that officers would take him. Further, it appeared to the trial court that Seymour and Horzepa only knew that Hunter knew Victorino. Concerning Hunter’s answers of “that’s it” and “I don’t have anything else to say,” the trial court wrote: “A careful reading of the statements and a review of the tape indicate that those statements were direct answers to questions by investigators.” The trial court further found that the investigators advised Hunter of his rights when they concluded he was a suspect and that their conduct made sense, was reasonable, and seemed to be careful and deliberative. In conclusion, applying the test enumerated by this Court in Ramirez v. State, 739 So.2d 568 (Fla.1999), the trial court wrote:
[I]t is clear to the court that the defendant was asked to voluntarily come to the police station to answer some questions. He voluntarily went and further testified to his lawyerl’ ]s question that he would have gone with his own transportation had that been available. It is apparent it was intended to be a voluntary statement. It is apparent from the review of the tapes and the transcript as well as the information presented that the purpose of the interview was to learn about Mr. Victorino and not necessarily about Mr. Hunter. The place selected was the Sheriffs Office so that the interview could be recorded and taped. The interrogation was quite civil during the early stages when the investigators were in the information gathering phase. It became a firmer interview when it became apparent that Mr. Hunter was not being honest with the officers and may have information that he wasn’t revealing or, for that matter, may have been involved. There is no question that he was confronted with some evidence but that was not a feature of the interview.
Hunter’s claim that the trial court erred is reviewed under the following standard:
“A trial court’s ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.” Appellate courts should accord a presumption of correctness to the trial court’s rulings on motions to suppress with regard to the trial court’s determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues.
Schoenwetter v. State, 931 So.2d 857, 866 (Fla.2006) (citations omitted) (quoting Rolling v. State, 695 So.2d 278, 291 (Fla.1997)).
Miranda warnings are required only when an individual is undergoing custodial interrogation. As this Court has explained,
A person is in custody if a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest. “The proper inquiry is not the unarticulated plan of the police, but rather how a reasonable person in the suspect’s position would have perceived the situation.”
*1064 [Ramirez, 739 So.2d] at 573 (citations omitted) (quoting Davis v. State, 698 So.2d 1182, 1188 (Fla.1997)). We set out in Ramirez the following four factors for a trial court to consider in determining if a suspect is in custody: (1) the manner in which the police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; and (4) whether the suspect is informed that he or she is free to leave the place of questioning. See id. at 574.
Schoenwetter, 931 So.2d at 866-67.
In light of the evidence before it, the trial court, in a comprehensive and well-reasoned order, properly applied this Court’s precedent and denied Hunter’s motion to suppress his statements. Hunter failed to demonstrate that he was in custody prior to being read his Miranda rights or that he had sought to terminate the interview. Thus, we affirm the trial court’s denial of Hunter’s motion to suppress his statements.
(B) Motion to Suppress Physical Evidence
Hunter argues that the trial court erred in denying his motion to suppress the shoe laces seized from his temporary residence. Specifically, Hunter asserts that the affiant to the search warrant made false and reckless statements, that the affiant lacked personal knowledge of the facts, and that the warrant failed to specify the parameters of the search. As discussed below, the trial court did not err in denying Hunter’s motion to suppress physical evidence.
“A trial court’s ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.”
Terry v. State, 668 So.2d 954, 958 (Fla.1996).
The trial court denied the motions to suppress on April 6, 2006. Specifically, as for Hunter’s claim that the affidavit resulting in issuance of the search warrant was defective because the affiant did not have personal knowledge of the information in the affidavit, the trial court found that the affidavit contained “a narrative of the investigation and an explanation regarding the property to be searched.” The trial court further found that
[t]he affidavit provides attribution to those individuals that provided information and hearsay statements concerning facts and circumstances surrounding the case. The providers of hearsay information clearly are identified citizens who provided information and do not fit into the category of anonymous tipster that require corroboration or verification as to their reliability.
The trial court also cited the “fellow officer rule” for the proposition that the officer obtaining the search warrant need not have firsthand knowledge to have probable cause. Lastly, the trial court rejected the claim that the warrant lacked particularity as it made clear that there was an ongoing murder investigation involving a large number of people subject to extensive brutality resulting in blood spatter throughout the house, that one suspect who had been apprehended had been staying at the residence, and that a second individual staying at the residence had admitted his involvement in the crimes.
The affiant’s lack of personal knowledge of the facts sworn in the affidavit is not determinative of legality of the search warrant.
If the affidavit creates a substantial basis for a finding of probable cause on its face, a defendant seeking to suppress the fruits of the warrant must establish *1065 that the affidavit contains statements that were intentionally false or made with reckless disregard for the truth. In the alternative, the defendant must demonstrate that the affidavit omits facts with intent to deceive or with reckless disregard for whether the information should have been revealed to the magistrate.
Pardo v. State, 941 So.2d 1057, 1066-67 (Fla.2006) (citations omitted). Hunter made no such showing.
Hunter’s challenge pertaining to the particularity requirement, given the nature of the offenses and the anticipated evidence due to the carnage discovered at the crime scene, is equally unavailing. Here, the warrant sought, in pertinent part, trace evidence, clothes, blood, saliva, genetic material, body fluids, and shoes. The warrant was sufficiently precise to include the seizure of the shoe laces, particularly as stains were observed on those seized. Moreover, “if the object of the warrant is not to obtain specific items of property, but rather to obtain all property of a certain character, it is not necessary to describe a particular article of property.” State v. Eldridge, 814 So.2d 1188, 1141 (Fla. 1st DCA 2002) (citing Carlton v. State, 449 So.2d 250, 252 (Fla.1984)).
In light of the above, we uphold the trial court’s denial of Hunter’s motion to suppress physical evidence.
(C) Motion for Mistrial
Hunter contends that the trial court erred in denying his motion for mistrial as his rights under the Sixth Amendment to confrontation and cross-examination were violated when the State’s witness, Cannon, the fourth perpetrator, refused to be cross-examined. Hunter argues that he was prejudiced as a result because Cannon implicated Hunter during his direct testimony. Upon review of the record, we conclude that Hunter is not entitled to relief.
At trial, the State called Cannon to testify in its case-in-chief. Cannon was a code-fendant and had pled guilty to all fourteen counts as charged. Cannon testified that he expected to be sentenced to life imprisonment without parole. However, Cannon testified that he was not guilty and therefore could not answer the State’s questions as to what happened. Cannon did testify that Victorino intended to kill everyone in the house and that he and Salas had no choice but to go with the others. Cannon further testified that he and Salas felt they had no choice because Victorino would kill them. Cannon thereafter denied doing anything but did explain that all of the defendants including himself went into the house where the murders occurred and everyone was armed with a baseball bat. Counsel for defendants Salas and Victorino objected to this testimony; counsel for Hunter did not.
Counsel for Victorino attempted to cross-examine Cannon. He would not answer any questions other than to repeat that he was not guilty. Cannon then testified that his lawyers made him plead guilty and that he wanted to withdraw his pleas. After Victorino’s defense attorney completed his cross-examination, counsel for Hunter expressly stated that “Mr. Hunter has no questions.” Counsel for Salas also declined to cross-examine Cannon.
The following morning, after the State had presented the testimony of seven witnesses, counsel for Salas renewed his motion for mistrial, adding the new grounds that counsel was concerned the State either knew or had reason to know that Cannon was not going to testify. Victorino and Hunter joined in the motion. However, the trial court denied the motion for mistrial, observing that, from opening statements, Cannon was expected to be a commentator as to what happened at the *1066 crime scene and that it was to the defendants’ benefit because the State was not able to elicit much of the information intended from Cannon. The trial court further found that everyone in the courtroom was surprised by Cannon’s testimony, including the State, which then requested that Cannon be declared an adverse witness. Finally, the trial court stated that none of the defendants requested that he strike Cannon’s testimony.
We deny Hunter’s claim. First, the alleged error was not preserved. Hunter did not seek a mistrial at the time of Cannon’s testimony on the basis that Cannon would not answer questions, and Hunter expressly waived his right to cross-examine the witness. Cf. Norton v. State, 709 So.2d 87, 94 (Fla.1997) (failing to object contemporaneously to a witness’s testimony waived right to raise issue on appeal, notwithstanding motion for mistrial at the close of the witness’s testimony). Moreover, the basis upon which Salas belatedly sought a mistrial, joined by Hunter, was not the Sixth Amendment, on which Hunter now relies, but a procedural rule.[6]
Accordingly, Hunter is not entitled to relief on this issue.
(D) Motion for Judgment of Acquittal
Hunter argues that the trial court erred in denying his motion for judgment of acquittal. According to Hunter, the State failed to prove that he conspired with the other codefendants, committed first-degree murder, committed a burglary, and abused three dead bodies. Further, Hunter contends that there was no physical evidence found at the crime scene identifying him, that nothing linked him to the murder weapons, and that he had a reasonable hypothesis of innocence that the State failed to overcome. As discussed below, we deny Hunter’s claim except in relation to the count of abuse of the dead body of victim Gonzalez.
“A motion for judgment of acquittal should not be granted by the trial court unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law.” Coday v. State, 946 So.2d 988, 996 (Fla.2006), cert. denied, -U.S. -, 127 S.Ct. 2918, 168 L.Ed.2d 249 (2007). On appeal of a denial of a motion for judgment of acquittal, the inquiry is dependent upon the evidence submitted, and “where the State submitted direct evidence, the trial court’s determination will be affirmed if the record contains competent and substantial evidence in support of the ruling.” Walker v. State, 957 So.2d 560, 577 (Fla.2007) (quoting Conde v. State, 860 So.2d 930, 943 (Fla.2003)). On the other hand, “[i]n circumstantial evidence cases, ‘a judgment of acquittal is appropriate if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.’” Id. (quoting Woods v. State, 733 So.2d 980, 985 (Fla.1999)).
We find Hunter’s arguments that nothing linked him to the murder scene or to the murder weapons and that the State failed to prove the armed burglary and felony murder counts to be without merit. His own trial testimony and statement to police establish otherwise. Hunter admitted to being at the crime scene when the house on Telford was broken into as well as when the victims were assaulted. And like the others, he was armed with a baseball bat. Medical testimony established that the victims were killed by blunt force *1067 trauma to the head inflicted by a baseball bat. Hunter admitted that he had gone to the house on Telford the night of the murders to retrieve his property and that Victorino kicked open the door for them to get inside. This constitutes direct evidence as to the armed burglary count as well as to the felony murder count.
Because Hunter did not confess to committing premeditated murder, abuse of a dead human body, and conspiracy to commit murder, armed burglary, aggravated assault, and tampering with physical evidence, the State’s case on those counts was based on circumstantial evidence. Hunter admitted to hitting at least two of the victims with his bat. Hunter and victim Gonzalez could not be excluded as the source of blood recovered from the shoe laces taken from shoes matching the description of the shoes Hunter had worn the night of the murders. Blood recovered from the left Nike’s tongue contained a mixture for which victim Vega’s DNA type was dominant. Blood recovered from the right Nike’s tongue contained a mixture, and victim Gonzalez could not be excluded. In addition, a blood-stained shoe impression left on a playing card in the Telford house could have been made by the right heel of Hunter’s shoes. Moreover, Graham’s testimony established that Hunter was present during the discussion about breaking into the Telford house and beating the occupants to death and that Hunter agreed to participate. Graham further testified that Victorino said they would not need masks because they were not going to leave any witnesses. Hunter did not deny being present during that conversation, but instead claimed there had not been a discussion about committing murder. Finally, Salas testified that he saw Hunter put a knife to victim Gleason’s throat and that Hunter said he stabbed victim Nathan. That the jury apparently believed Salas and discredited Hunter’s testimony does not provide a basis for relief. Moreover, evidence was produced that victims Gleason and Nathan were cut or stabbed postmortem.
Given this evidence, we conclude that there is competent evidence of Hunter’s guilt upon ten of the eleven counts for which he was convicted. However, as to the victim Gonzales, there does not appear to be sufficient evidence that Hunter abused a dead human body. Therefore, Hunter’s conviction on that count is vacated.
(E) Motion to Sever
Hunter argues that the trial court erred in denying his motion to sever his trial from that of his two codefendants. The trial court properly denied the motion.
Pretrial, Hunter filed a motion to sever, contending that statements made by the codefendants were inadmissible under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). On appeal, in addition to relying upon Bruton, Hunter argues for the first time that the failure to sever resulted in jury confusion based upon the enormity of the prosecution and the fact that the individual defendants had inconsistent defenses. Finally, Hunter argues that even if the trial court did not err in not severing the guilt phase of trial, the trial should have been severed at the penalty phase.
Specifically regarding his pretrial motion to sever his case from that of his codefendants, Hunter argued that the co-defendants had made either oral or written statements making reference to Hunter that were not admissible. At the hearing on the motions [7] to sever, the State advised the trial court that it would not be introducing any actual statements made by any of the defendants. Instead, it would pres *1068 ent the testimony of the investigating officers who took the statements and redact or not present what one defendant said in relation to the involvement of the others.
At that pretrial hearing, counsel for Vic-torino argued his motion to sever first. In arguing the motion to sever, he relied upon Bruton as well as the fact that while he denied all involvement in the case, all of his codefendants implicated him.
Hunter’s counsel argued his motion next. He began as follows:
In addition to what Mr. Dowdy’s argued to the Court, I’ve got some concerns that we may be putting the cart before the horse according to the rule. The Bruton case and a number of cases that I’ve seen from various counsel distributing here this afternoon were all decided pre-rule, if you will. The Florida Supreme Court enacted 3.152, and in this case, Subsection (B) setting forth the procedure if you will, for making the determination as to whether cases are going to be severed or whatever.
(Emphasis added.) At no time did Hunter argue that he was entitled to a severance based upon inconsistent defenses between the defendants or jury confusion.
The trial court denied the motions to sever. The trial court first determined that there were statements that, if admitted without being redacted, would violate the individual defendant’s right to a fair trial. The trial court then determined that the fact that the codefendants may raise inconsistent defenses was not sufficient to require severance. Nor would the fact that multiple defendants would be tried together, conceivably resulting in multiple and varied objections during trial with lengthy conferences, require severance. The trial court concluded that it had not been shown that the case was unmanageable. Finally, the trial court decided that in the event more than one defendant was convicted of first-degree murder, the penalty phase should not be severed.
Hunter does not demonstrate that the trial court abused its discretion. Florida Rule of Criminal Procedure 3.152(b)(1)(A) directs that severance between defendants before trial shall be granted upon a showing that the order is necessary to protect a defendant’s right to a speedy trial or is appropriate to promote a fair determination of the guilt or innocence of one or more defendants. Pursuant to subpart (b)(2) of the rule, upon a defense motion, the court must determine if the State intends to introduce evidence of a statement that makes reference to another defendant that is not admissible as to the moving defendant. If so, the rule
requires the State to elect one of three courses: (1) a joint trial at which evidence of the statement is not admitted; (2) a joint trial at which evidence of the statement is admitted after all references to the moving defendant have been deleted, provided the court determines that admission of the evidence with deletions will not prejudice the moving defendant; or (3) severance of the trial.
Smith v. State, 699 So.2d 629, 643 (Fla.1997). Under the facts of this case, the trial court complied with rule 3.152(b)(2).
Moreover, Hunter’s Bruton claim lacks merit. As this Court has explained,
[i]n Bruton the United States Supreme Court held that a defendant’s rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution were violated by the introduction of a non-testifying codefendant’s confession which named and incriminated the defendant at a joint criminal trial. The crux of a Bruton violation is the introduction of statements which incriminate an accused without affording him *1069 an opportunity to cross-examine the de-clarant.
Looney v. State, 803 So.2d 656, 671 (Fla.2001) (citation omitted). Hunter fails to identify the codefendant statements that would otherwise have not been admissible if he had been tried alone. The record reflects that any admitted out-of-court statements made by Hunter’s codefen-dants were limited to each describing his own actions and not what Hunter purportedly said or did. Further, all of the code-fendants testified at trial and thus were subject to cross-examination by one another. Irrespective of that fact, Hunter argues in conclusory fashion that he “could not cross-examine Salas on what he said about the bats because it was the defendant that allegedly gave the bats to him.” The fact that Hunter chose not to cross-examine Salas about the baseball bats because he believed Salas would testify that Hunter gave out the bats does not implicate Bruton,[8]
Assuming that Hunter preserved the jury confusion and inconsistent defense bases for seeking severance, the trial court did not err in denying his motion. Whether the defendants could possibly have antagonistic defenses would not in itself justify severance of codefendants. See Lugo v. State, 845 So.2d 74, 97 n. 41 (Fla.2003). “A strategic advantage or hostility among defendants does not, by itself, require severance.” Coleman v. State, 610 So.2d 1288, 1285 (Fla.1992). “If the defendants engage in a swearing match as to who did what, the jury should resolve the conflicts and determine the truth of the matter.... [T]he defendants are confronting each other and are subject to cross-examination upon testifying, thus affording the jury access to all relevant facts.” McCray v. State, 416 So.2d 804, 806 (Fla.1982). As stated, each defendant testified at trial; Salas and Hunter provided conflicting testimony as to who did what, while Victorino denied any involvement in the crimes. Moreover, “the fact that the defendant might have a better chance of acquittal or a strategic advantage if tried separately does not establish the right to a severance.” Id.
We also conclude that the jury was able to differentiate between defendants. Though all three defendants were similarly charged, the jury clearly differentiated between them in its verdicts.[9]
Finally, as to Hunter’s contention that the penalty phase should have been severed, he failed to preserve that claim below. In any event, as in the guilt phase, the jury differentiated between the defendants, recommending death for the murders of victims Belanger and Ayo-Roman only as to Victorino, recommending death for the murders of victims Gleason, Gonzalez, Nathan, and Vega only as to Hunter, while returning all life sentence recommendations as to Salas.
*1070 Given the above, we affirm the trial court’s denial of Hunter’s motion to sever.
(F) “And/Qr” in the Jury Instructions
Next, Hunter raises instructional error during the guilt phase. For each of the instructions defining a criminal offense, where an element provided for inclusion of the name of the defendant, the trial court instructed as “TROY VICTORINO and/or JERONE HUNTER and/or MICHAEL SALAS.” On appeal, Hunter argues that this use of the conjunction “and/or” between the defendants’ names resulted in reversible error. And even if there was not a proper objection raised, the error was fundamental. His contention is that given this instruction, the jury may have convicted him solely upon a finding that a codefendant’s conduct satisfied an element of the offense. Hunter is not entitled to relief on this claim.
First, of the offenses for which he was convicted, Hunter only preserved the objection as to criminal conspiracy and abuse of a dead human body. Hunter expressly did not join in the objections made by other counsel to the use of “and/or” in the first-degree murder instructions and the burglary instruction. Moreover, he did not object to the felony murder instructions on the basis now asserted.[10]
We recently addressed the propriety of using “and/or” in jury instructions in cases involving multiple defendants. Garzon v. State, 980 So.2d 1038 (Fla.2008). In Garzón, the three defendants, each charged with criminal conspiracy, armed burglary of a dwelling, armed robbery, three counts of armed kidnapping, and extortion, did not object to the instructions using the conjunction but instead, two co-defendants raised the issue on direct appeal. Id. at 1039. According to the defendants, “the use of ‘and/or’ allowed the jury to convict the defendants based on a codefendant committing some or all of the elements of the charged crimes.” Id. at 1041. We reiterated that use of the conjunction “and/or” in jury instructions is error. Id. at 1045 (citing Cochrane v. Florida East Coast Ry. Co., 107 Fla. 431, 145 So. 217, 218 (1932)). However, because the defendants failed to object, the question presented was whether the error was fundamental. Id. at 1042. In Garzón, we answered the question in the negative, looking to the totality of the record. Id. at 1043. Fundamental error in a jury instruction requires that the error “reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.” Id. at 1042 (quoting State v. Delva, 575 So.2d 643, 644-45 (Fla.1991)).
Here, because Hunter failed to object to the use of “and/or” as it related to the murder instructions (both premeditated and felony) and the armed burglary instructions, we must determine if the error was fundamental. Under the totality of the circumstances, the error was not fundamental. In addition to the erroneous instructions, the jury was instructed on both the law of principals and multiple defendants. It was then instructed upon and provided verdict forms that were individualized both as to the defendants and in respect to the crimes charged. Furthermore, in his closing argument, Hunter’s counsel focused on his client’s actions and discussed how a verdict as to guilt for one defendant did not mean that the same verdict had to be arrived at for the others. Hunter’s counsel explained that the evidence was to be weighed “as to each defen *1071 dant as to each count.” The State briefly addressed the principals instruction, explaining that “if someone helps someone else commit a crime, then they must be treated the same as if — the actual perpetrator.” The evidence at trial, the testimony of Brandon Graham, the forensic evidence, the testimony of codefendant Salas, Hunter’s pretrial statements to law enforcement officers, and his own trial testimony strongly tied Hunter to these crimes. Under the totality of these circumstances, the improper use of “and/or” in the murder and armed burglary instructions does not constitute fundamental error.
As stated earlier, the “and/or” error was preserved as to the criminal conspiracy and abuse of a dead human body counts. If the error is preserved, the issue on appeal is whether the instructional error was harmless. Randolph v. State, 853 So.2d 1051, 1065 (Fla.2003); Jennings v. State, 782 So.2d 853, 862-863 (Fla.2001). An error is deemed harmless where there is no reasonable possibility that the faulty instruction contributed to the verdict. State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). Here, the error was harmless. The evidence of Hunter’s involvement in the conspiracy was overwhelming. And it is clear from the verdicts on the abuse of a dead human body counts that the jury was able to differentiate between the defendants, having acquitted Salas of all five counts, convicted Victorino of that offense in relation to victim Belanger, and convicted Hunter of that offense in relation to victims Gleason and Vega. See Salas v. State, 972 So.2d 941, 952-954 (Fla. 5th DCA 2007).[11] As a result, we deny relief on this claim.
(G) Aggravating Factors Outweighed the Mitigating Factors
Hunter next challenges the trial court’s weighing of aggravating and mitigating factors. Specifically, Hunter argues that the trial court assigned improper weights to the mitigating factors and improperly balanced the mitigation against the aggravating factors. Hunter’s claim lacks merit.
“[W]eighing the aggravating circumstances against the mitigating circumstances is the trial judge’s responsibility and it is not this Court’s ‘function to reweigh those factors.’” Bevel v. State, 983 So.2d 505, 522 (Fla.2008) (quoting Hoskins v. State, 965 So.2d 1, 19 (Fla.2007)). Moreover, the weight that the trial court ascribes to the aggravating and mitigating circumstances is subject to review for an abuse of discretion. Merck v. State, 975 So.2d 1054, 1065 (Fla.2007), petition for cert. filed, No. 07-10853 (U.S. May 9, 2008).
Hunter does not identify the manner in which the trial court abused its discretion. Instead, he argues that the age mitigator must be given great weight under Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and Ramirez v. State, 739 So.2d 568 (Fla.1999). Contrary to Hunter’s argument, the United States Supreme Court did not hold in Eddings that age of the defendant is a mitigating fact that should be given a particular weight. Rather, it simply held that, “[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.” 455 U.S. at 113-14, 102 S.Ct. 869. And in Ramirez we simply *1072 applied the principle that “when the murder is committed by a minor, the mitigating factor of age must be found and given ‘full weight.’ ” 739 So.2d at 582 (emphasis removed) (quoting Ellis v. State, 622 So.2d 991, 1001 n. 7 (Fla.1993)).
Here, the trial court did not refuse to consider Hunter’s age as a mitigator. Specifically, the trial court found:
The defendant was 18 years of age at the time of the murders. In addition, the defendant presented testimony of Dr. Eric Mings, Dr. Rubin Gur and Dr. Allen Berns which suggested that in addition to his age, Mr. Hunter was in the early stages of schizophrenia, perhaps even paranoid schizophrenia. Their diagnosis and conclusions were based on the core history of severe mental illness, perhaps schizophrenia, of Mr. Hunter’s father and at least some treatment for mental problems on the part of his mother. These factors suggest that Mr. Hunter was much more likely than others to have a mental defect or disease. Historically he had lost a twin brother as an infant and apparently over his childhood had regularly spoken to his twin as though that person was present in his life which was reliably established. The doctors felt that he had impaired judgment and was described from time to time as a loner. This mitigator has been established and the court gives it some weight.
Moreover, Hunter’s reliance upon the individual concurring opinions in Coday v. State, 946 So.2d 988, 1009-26 (Fla.2006) (Quince, J., specially concurring) (Bell, J., concurring) (Anstead, J., concurring in part and dissenting in part) (Pariente, J., concurring in part and dissenting in part), cert. denied, — U.S.-, 127 S.Ct. 2918, 168 L.Ed.2d 249 (2007), in support of his argument that the trial court improperly weighed the mitigating evidence and balanced the aggravating factors against the mitigation, is likewise misplaced. In Co-day, this Court was not presented with the issue of whether the trial court abused its discretion in assigning weights to the applicable aggravating and mitigating factors or engaged in improper weighing. More specifically, this Court did not hold that the age mitigator must be given great weight. Instead, we addressed whether the trial court erred in its finding that a specific mitigating circumstance was not established in the first place. 946 So.2d at 1000-05. Hunter does not argue that the trial court erred in not finding all of the mitigators he submitted but rather that the trial court failed to accord greater weight to two of the mitigating circumstances it did find, i.e., age of the defendant and defendant’s level of maturity. Contrary to Hunter’s assertion, the trial court engaged in the type of consideration and analysis regarding aggravating and mitigating circumstances that we have previously required, which was specifically addressed by the concurring opinion in Co-day upon which Hunter relies. See id. at 1014-15 (Quince, J., specially concurring) (quoting Campbell v. State, 571 So.2d 415, 419-20 (Fla.1990)).
Given the above discussion, Hunter’s claim regarding the trial court’s weighing of the aggravating and mitigating circumstances lacks merit.
(H) Proportionality Review
Additionally, Hunter raises two challenges pertaining to this Court’s proportionality review. First, he argues generally that our proportionality review is legally insufficient because this Court only considers cases where death has been imposed. Second, Hunter argues specifically that his death sentence is disproportionate. We deny each of these claims in turn.
Relying upon the American Bar Association’s report entitled Evaluating Fairness and Accuracy in the State Death *1073 Penalty System: The Florida Death Penalty Assessment Report, published September 17, 2006, Hunter contends that the Court’s proportionality review should include cases where death was imposed, where death was sought but not imposed, where death could have been but was not sought, and cases from other states and federal decisions. Hunter further argues that the imposition of the death sentence in this case is not consistent with Florida cases, citing Lanzafame v. State, 751 So.2d 628 (Fla. 4th DCA 1999), or with cases from other states, citing In re Elkins, 144 Cal.App.4th 475, 50 Cal.Reptr.3d 503 (2006). Finally, he contends that the United States Supreme Court’s decision in Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), holding that proportionality review is not constitutionally required, should be overruled.
This Court performs “a proportionality review to prevent the imposition of ‘unusual’ punishments contrary to article I, section 17 of the Florida Constitution.” Simmons v. State, 934 So.2d 1100, 1122 (Fla.2006). Accordingly, Hunter’s argument that the Court should consider cases from other states as well as federal cases would subject interpretation of the Florida Constitution to decisional law of other jurisdictions and result in the comparison of death sentences that rest upon differing considerations and standards. Moreover, comparison of non-death sentence cases, such as those cited by Hunter, to those where death was imposed would introduce factors completely unrelated to whether the sentence was “unusual.” Comparative proportionality review inquires into whether the penalty in this particular case is proportionate to that imposed in cases where the facts of the ease and circumstances relating to the defendant are comparable to those cases where death has been imposed. That is, this Court “make[s] a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” Rodgers v. State, 948 So.2d 655, 669 (Fla.2006) (quoting Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003)), cert. denied, — U.S. -, 128 S.Ct. 59, 169 L.Ed.2d 50 (2007).
Further, Hunter’s invitation for this Court to overturn United States Supreme Court precedent, namely Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), is without foundation. See Rodriguez de Quijas v. Shearson/American Exp., Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526(1989) (stating that it is the prerogative of the United States Supreme Court to overrule its own decisions and not that of the lower courts); see also Marshall v. Crosby, 911 So.2d 1129, 1135 (Fla.2005) (citing Rodriguez de Quijas).
Accordingly, we reject Hunter’s broad challenge to the manner in which this Court conducts its proportionality review in death cases.
Hunter also argues that his death sentence[12] is disproportionate when analyzed under the Court’s current practice. As indicated above, our “proportionality review involves consideration of the totality of the circumstances of a case and comparison of that case with other death penalty cases.” Snipes v. State, 733 So.2d 1000, 1007 (Fla.1999). Contrary to his argument, we conclude that Hunter’s death sentences are proportionate.
Here, the evidence established that Hunter was a willing participant in the *1074 killing of six individuals, having been convicted by a jury of both premeditated and felony murder as to each murder. The murders were especially brutal, with all victims having been beaten to death with baseball bats, resulting in extensive head injuries and disfigurement. The aggravating circumstances were extensive, including that the murders were heinous, atrocious, or cruel (HAC) (very substantial weight); that they were cold, calculated, and premeditated (CCP) (great weight); murders were committed to avoid arrest (moderate weight); that Hunter had been convicted of a capital felony (very substantial weight); and that the murders were committed while defendant was engaged in the commission of a burglary (moderate weight). In contrast, the mitigation was marginal, including the age of the defendant (some weight); that he was under extreme duress or under the substantial domination of another (some weight); that he had no significant history of prior criminal activity (little weight); that he was very immature (little weight); his good conduct during incarceration (very little weight); and his good conduct at trial (very little weight). Hunter is of average intelligence (full scale IQ of 91), and although he was diagnosed by the defense experts with schizophrenia, it was believed Hunter was in the early stages of the disease. Further, while Hunter reportedly believed that he had conversations with his deceased twin brother from the time he was a young child, the record further established that Hunter was close to graduating from high school when he committed the murders, was in the 49th percentile of his class, and participated in team sports.
Cases relied upon by Hunter in support of his claim are distinguishable. First, only one of the cases cited involved multiple killings, Ferry v. State, 507 So.2d 1373 (Fla.1987), but that decision does not address proportionality. Instead, in Ferry this Court reversed upon an entirely different issue. See id. at 1376. The remaining cases Hunter cites presented significantly less aggravation and more mitigation than that found in this case. For instance, in Snipes, only two aggravators were found, while “substantial” mitigation was found. Similarly, Robertson v. State, 699 So.2d 1343 (Fla.1997), receded from on other grounds by Delgado v. State, 776 So.2d 233 (Fla.2000), included two aggra-vators — murder committed during the course of a burglary and HAC — but included “substantial mitigation,” namely defendant’s age of nineteen, impaired capacity at the time of the murder due to drug and alcohol use, abused and deprived childhood, history of mental illness, and borderline intelligence. Id. at 1347.
In addition, we reject Hunter’s claim that his sentences are disproportionate because of the disparate treatment between Hunter and his codefendants. As we previously explained, “disparate treatment is permissible where one defendant is more culpable than the others.” Kormondy v. State, 845 So.2d 41, 47 (Fla.2003). First, Hunter did not argue this point to the trial court. Secondly, Cannon pled guilty; Hunter put the State to its burden. Third, the evidence established that Hunter was more culpable than Salas, who received terms of life imprisonment upon the jury’s recommendation. For example, evidence was presented that Hunter killed victim Nathan after finding her hiding under a blanket and after she pled for her life. Thus, disparate treatment between Hunter and his codefendants does not demonstrate that the sentences are not proportionate.
Under the totality of the circumstances, we conclude that Hunter’s death sentences are proportional in relation to other sentences of death upheld by this Court. See, e.g., Lugo v. State, 845 So.2d 74 (Fla.2003) (two murders committed; aggravating eir- *1075 cumstances included CCP, prior violent felony, commission during the course of a kidnapping, for the purpose of avoiding arrest, for pecuniary gain for both murders, and HAC for one of the murders; no statutory mitigating circumstances and five nonstatutory mitigators given little or very little weight); Knight v. State, 746 So.2d 428 (Fla.1998) (two murders committed; aggravating circumstances included CCP, prior violent felony, during the commission of a kidnapping, avoiding or preventing a lawful arrest, which outweighed three nonstatutory mitigators — victim of child abuse, some degree of paranoia, and having been raised in poverty); Francois v. State, 407 So.2d 885 (Fla.1981) (six murders committed, two prior violent felonies, murders committed in the course of committing robbery, murder committed to eliminate witnesses, HAC; no mitigators).
Accordingly, Hunter’s death sentences are proportional.
(I) Lethal Injection Procedures
Hunter argues that lethal injection, the chemicals used to carry out a death sentence, and Florida’s procedures for administrating the death penalty are unconstitutional under both the Florida and United States Constitutions. According to Hunter, lethal injection violates the proscription against cruel and unusual punishment because it inflicts undue pain on the inmate. Hunter also argues that Florida’s lethal injection statute constitutes an unconstitutional delegation of legislative authority and violates due process because the Legislature failed to give the Florida Department of Corrections any intelligible principle to create a rule of lethal injection protocol. Both claims are without merit.
With respect to Hunter’s Eighth Amendment challenge to Florida’s lethal injection protocol, the Court has recently rejected such claims. See Sexton v. State, 997 So.2d 1073, 1089 (Fla.2008); Griffin v. State, 992 So.2d 819 (Fla.2008); Woodel v. State, 985 So.2d 524 (Fla.2008); Lebron v. State, 982 So.2d 649 (Fla.2008); Schwab v. State, 982 So.2d 1158 (Fla.2008); Lightbourne v. McCollum, 969 So.2d 326, 345 (Fla.2007); Schwab v. State, 969 So.2d 318, 325 (Fla.2007). Hunter offers nothing in addition to warrant a different determination.
In respect to Hunter’s challenge to Florida’s lethal injection protocol based upon an alleged unconstitutional delegation of duty, he failed to raise that argument below; thus, the claim is not preserved for review. Moreover, as Hunter acknowledges, we have previously rejected this claim. See Diaz v. State, 945 So.2d 1136, 1143 (Fla.2006); Sims v. State, 754 So.2d 657, 670 (Fla.2000). And most recently, we reaffirmed our rejection of that claim in Sexton. 997 So.2d at 1089.
Accordingly, Hunter is not entitled to relief based upon his lethal injection claims.
(J) Ring v. Arizona Claims
Lastly, Hunter argues that his death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).[13] Hunter was charged with and convicted of commit *1076 ting six first-degree murders, both premeditated and felony murder. Those convictions by a unanimous jury formed the basis for the trial court’s finding of the prior violent felony aggravator. Consequently, Ring is inapplicable. See, e.g., Bevel v. State, 983 So.2d 505 (Fla.2008); Carter v. State, 980 So.2d 473, 484-85 (Fla.2008), petition for cert. filed, No. 08-5606 (U.S. July 2, 2008). Moreover, we have previously rejected his arguments regarding the constitutionality of Florida’s capital sentencing scheme. See, e.g., Merck v. State, 975 So.2d 1054, 1067 (Fla.2007) (defendant not entitled to notice of aggravators in the indictment and jury may recommend death by majority vote), petition for cert. filed, No. 07-10853 (U.S. May 9, 2008); Frances v. State, 970 So.2d 806, 822 (Fla.2007) (Ring does not require aggravating circumstances to be found individually by unanimous jury), cert. denied, — U.S. -, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008); Kormondy v. State, 845 So.2d 41, 54 (Fla.2003) (special verdict forms not required under Ring). Thus, we conclude that Hunter’s Ring claims are without merit.
III. CONCLUSION
For the reasons discussed above, we deny Hunter’s claims raised on appeal and affirm his convictions and sentences.
It is so ordered.
QUINCE, C.J., WELLS, PARIENTE, LEWIS, and BELL, JJ, and CANTERO, Senior Justice, concur.
ANSTEAD, J., dissents with an opinion.

. Graham had not shown up at the prearranged meeting place and did not take part in the murders.

. The physical evidence at trial established that Victorino wore a size thirteen, had a pair of size thirteen boots, and had been wearing those boots the night of the murders, and that the shoe print on the front door of the Telford residence was from the left boot that had been recovered at the house where Hunter and Victorino had been living. In addition, Victorino’s fingerprint was recovered from a boot box seized from Cannon’s Ford Expedition. The impressions on the sheet from Tel-ford could have been made by the boots, and the shoe imprint on the pay stub found at the crime scene was from the left boot. There were several suspicious red-brown stains on the boots. DNA testing on the boots revealed a match with the profile of victims Belanger, Vega, and Ayo-Roman. Vega’s and Gonzalez’s profiles could not be excluded from another stain on the boots. Testing of the playing cards recovered at the scene revealed one impression that could have been made by the right boot, while the impression on the other card could have been made by the right heel of the tennis shoe later identified as belonging to Hunter. DNA testing of the knife blade found at the scene revealed a mixture of the profiles of at least two people, which included Gleason, while Vega and Gonzalez could not be excluded. The knife handle included a mixture of DNA from two or more persons; Vega was the major contributor, and Gleason and Gonzalez could not be excluded. Sunglasses recovered from Cannon’s vehicle had victim Ayo-Roman’s fingerprint on them. Glass fragments found in Cannon's vehicle could have originated from a broken glass lamp at the crime scene. The two bats recovered submerged in water did not reveal DNA material. A sample from one of the bats that had not been under water revealed a mixture of at least two people, with Gonzalez as the dominant contributor. The other bat, also recovered above water, revealed a mixture of two or more persons, and victims Belanger, Ayo-Roman, and Gonzalez could not be excluded. A hair recovered from one of the bats was later determined to match the profile of Nathan. The Nike shoes, which had been washed, had diluted stains on the tongues of each shoe. The left shoe tongue revealed a mixture of two or more people, with Vega as the dominant contributor. Nathan could not be excluded. The tongue from the right shoe also contained a mixture; Gonzalez could not be excluded. One of the shoe laces that had been in the laundry basket at the house where Hunter and Victorino lived revealed a mixture, and Gonzalez and Hunter could not be excluded.

. The trial transcript reads that Dr. Gur said the "lymphic” system. This appears to be an error in transcription.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. In addition to the claims properly raised on appeal, Hunter also raised two noncognizable claims, each challenging the effective assistance of trial counsel. As we recently discussed in Smith v. State, 998 So.2d 516 (Fla.2008), such claims are not cognizable on direct appeal, with rare exception. Id., 998 So.2d at 522-23. Because Hunter’s claims do not fall within that rare category of cases, i.e., where both prongs of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), are manifest in the record, the claims are not properly before us. We further note that in his first issue briefed, Hunter invites the Court to adopt a standard of review in capital cases based solely upon article I, section 9 of the Florida Constitution. This does not present a claim of error for appellate review, and of his cognizable claims, Hunter failed to preserve this as the basis for relief.

. The State may not call a witness to testify that it knows will invoke his or her Fifth Amendment right against self-incrimination. Richardson v. State, 246 So.2d 771, 777 (Fla.1971). Nor may the defense. Faver v. State, 393 So.2d 49, 50 (Fla. 4th DCA 1981).

. Each of the defendants filed a motion to sever.

. Salas actually testified at trial during his direct examination that Victorino handed out the bats.

. The jury acquitted Victorino of counts IX through XII — i.e., Abuse of a Dead Human Body with a Weapon (Ayo-Roman), Abuse of a Dead Human Being with a Weapon (Gonzalez), Abuse of a Dead Human Body with a Weapon (Gleason), and Abuse of a Dead Human Body with a Weapon (Vega); acquitted Salas of counts VIII through XII and XIV— i.e., Abuse of a Dead Human Body with a Weapon (Belanger), Abuse of a Dead Human Body with a Weapon (Roman), Abuse of a Dead Human Being with a Weapon (Gonzalez), Abuse of a Dead Human Body with a Weapon (Gleason), and Abuse of a Dead Human Body with a Weapon (Vega), and Cruelty to Animals; and acquitted Hunter of counts VIII and IX — i.e., Abuse of a Dead Human Body with a Weapon (Belanger) and Abuse of a Dead Human Body with a Weapon (Ayo-Roman).

. Hunter joined in the objection to the felony murder instructions on the basis that the State had proceeded at trial under a premeditated murder theory and the evidence did not support the felony murder theory.

. As discussed above, we vacate the conviction of abuse of a dead human body as it relates to victim Gonzalez.

. Hunter refers to a single death sentence, notwithstanding the imposition of four death sentences.

. Specifically, Hunter argues that: (A) the aggravating circumstances are elements of the offense and should have been charged in the indictment and found by the jury beyond a reasonable doubt; (B) the jury and not the judge must make the necessary findings of fact to determine eligibility for the death pen-ally and as to whether death should be imposed; (C) a special verdict form should have been submitted to the jury for them to have made the specific findings on each aggravating factor; (D) the jury must unanimously find the existence of aggravating factors and that death should be imposed; (E) the requirement that the defendant must prove that the mitigating circumstances outweigh the aggravating circumstances results in an unconstitutional burden shifting by creating a presumption of death; (F) “Sufficient aggra *1076 vating circumstances" is not defined; thus, the instructions are unconstitutionally vague; (G) the statutory procedure contravenes the independent reweighing requirement of Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); (H) Florida's failure to follow Ring violates Hunter's right to equal protection of the law because Florida is the only state that imposes the death penalty upon a majority vote by the jury as to the existence of aggravating circumstances and upon recommendation of death; (I) Florida's statute fails to prevent the arbitrary and capricious imposition of the death penalty; (J) the jury instructions violate Brewer v. Quarter-man, 550 U.S. 286, 127 S.Ct. 1706, 167 L.Ed.2d 622 (2007), Smith v. Texas, 550 U.S. 297, 127 S.Ct. 1686, 167 L.Ed.2d 632 (2007), Abdul-Kabir v. Quarterman, 550 U.S. 233, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007), and Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) — cited without elaboration; and (K) the jury instructions are deficient for failing to include the mandate that death may not be imposed if an individual juror has any residual or lingering doubt as to how the murder was committed and whether the victims felt any pain, citing Oregon v. Guzek, 546 U.S. 517, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006).