DAMOORGIAN, C.J.
Tyson L. Chaffin appeals his convictions and sentences for second degree murder and tampering with evidence. He makes the following arguments on appeal: 1) the trial court erred in denying his motion for judgment of acquittal; 2) the trial court erred in denying his motion to suppress his pre-arrest statements; 3) the trial court gave an erroneous jury instruction on justified use of force; and 4) the State created fundamental error by submitting two separate incidents of tampering to the jury. We reverse the tampering conviction but affirm the second degree murder conviction.

Background

This is a particularly sad case involving a patricide that was allegedly committed in self-defense. On August 1, 2009, Chaffin (then 26 years old) fatally shot his father at their home. At the time of the fatal encounter, Chaffin’s father was in a drunken rage over the fact that Chaffin’s girlfriend threatened to call the police and inform them that the father was operating a marijuana grow house at the home. As a result of the threat, the father disassembled the grow house and kicked Chaffin out of the home. While Chaffin was in his bedroom gathering his belongings, his father, who was wearing a gun holstered to his hip, continuously yelled at Chaffin from outside the home, accusing Chaffin of ruining his life. Chaffin maintained that his father was acting aggressively and was ripping the siding off of the home. Allegedly fearing that his father was going to shoot him, Chaffin took a gun out of his bedroom closet, aimed it out of the window, and fatally shot his father in the head. Chaffin then put his father’s body in a wheelbarrow, wheeled it into the backyard, and buried it. He also burned his clothing and cleaned up the area where his *611 father was shot. He claimed he covered up the shooting instead of calling the police out of fear that he would be arrested for the grow house activity.
About two weeks later, police received a tip that Chaffin killed his father and paid a visit to the home. There, they encountered Chaffin’s mother, who told the police that they needed to speak with Chaffin. The mother called Chaffin and he agreed to meet them at the police station. Upon arriving at the police station, Chaffin was brought to an interview room with a camcorder running and was immediately read his Miranda[1] rights. Before and after he was read his rights, one of the interviewing detectives referred to the rights as a “formality.” Chaffin repeatedly acknowledged that he understood his rights and wished to speak to the detectives and read and signed the Miranda waiver form. After he signed the waiver, a detective again asked Chaffin if he understood his rights, to which Chaffin responded: “Uh, basically I have a right to an attorney, right?” The officers proceeded with questioning, and Chaffin confessed to killing his father and burying him in the backyard, maintaining that he did so because he was scared for his life and was sure that his father was going to pull his gun and shoot at him if given the opportunity. Chaffin later filed a motion to suppress his statements which the trial court denied.
Chaffin was charged by information with one count of first degree murder and one count of tampering with evidence. The information did not provide a factual basis for the tampering charge, and when asked by the court for clarification as to whether the charge went to concealing the grow house or burying the father’s body, the State represented that “it could be either one.” The case proceeded to a jury trial, where the primary issue for the jury to consider was whether Chaffin acted in self-defense. Chaffin moved for a judgment of acquittal on all counts, which the trial court denied. After considering all of the evidence, which included Chaffin’s confession and testimony, testimony from the investigating officers, and testimony from Chaffin’s mother and family friends regarding the father’s temperament and behavior, the jury found Chaffin guilty of the lesser included offense of second degree murder and of tampering with evidence. This appeal follows.

Analysis

Although we are only reversing Chaf-fin’s tampering conviction, we also write to set forth our reasoning for affirming the trial court’s denial of Chaffin’s motion for judgment of acquittal on the second degree murder conviction and his motion to suppress his confession. We affirm on the remaining issues raised by Chaffin without comment.

a) Second Degree Murder Conviction

Chaffin asserts that the trial court erred in denying his judgment of acquittal because the State failed to rebut his theory of self-defense and the evidence did not support a second degree murder conviction. After carefully reviewing the record, we hold that there was no error.
When reviewing a trial court’s decision on a motion for judgment of acquittal, the appellate court applies a de novo standard of review. Romero v. State, 901 So.2d 260, 264 (Fla. 4th DCA 2005). In Johnston v. State, 863 So.2d 271 (Fla.2003), the Florida Supreme Court reviewed the principles that govern a motion for judgment of acquittal:
Generally, an appellate court will not reverse a conviction that is supported by *612 competent, substantial evidence. There is sufficient evidence to sustain a conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements' of the crime beyond a reasonable doubt. “A motion for judgment of acquittal should be granted in a circumstantial evidence case if the [Sjtate fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.” “The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.” In meeting its burden, the State is not required to “rebut conclusively, every possible variation of events” which could be inferred from the evidence, but must introduce competent evidence which is inconsistent with the defendant’s theory of events. Once the State meets this threshold burden, it becomes the jury’s duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
Id. at 283 (internal citations omitted).

i) Self-Defense

When the defendant claims self-defense in a murder case, the state is required to prove that the defendant did not act in self-defense beyond a reasonable doubt. Rasley v. State, 878 So.2d 473, 476-77 (Fla. 1st DCA 2004). “If a defendant establishes a prima facie case of self-defense, the state must overcome the defense by rebuttal, or by inference in its case in chief.” State v. Rivera, 719 So.2d 335, 337 (Fla. 5th DCA 1998). “Under Florida law, a person is justified in using deadly force in self-defense when he or she reasonably believes such force is necessary to prevent imminent death or great bodily harm_” Michel v. State, 989 So.2d 679, 681 (Fla. 4th DCA 2008). “The law does not ascribe a subjective standard as to a defendant’s state of mind, but concerns a reasonably prudent person’s state of mind.” Reimel v. State, 532 So.2d 16, 18 (Fla. 5th DCA 1988). Further, “[t]he question of self-defense is one of fact, and is one for the jury to decide where the facts are disputed.” Dias v. State, 812 So.2d 487, 491 (Fla. 4th DCA 2002).
Here, the State presented sufficient evidence to create a jury question regarding Chaffin’s self-defense claim. First, Chaffin’s version of the events was not entirely corroborated by the evidence as testimony of one of the investigating officers contradicted Chaffin’s story that the father was ripping the siding off of the Home right before he was shot. Second, the evidence created a fact issue as to whether a reasonable person in Chaffin’s shoes would have believed danger was imminent — during his videotaped confession Chaffin admitted that his father never stated he was going to shoot or kill him, and his father did not ever reach for his gun. Finally, Chaffin’s actions after the shooting consisted of concerted efforts to cover up his actions. He cleaned up the area where he shot his father, buried his father in the backyard, and burned any remaining evidence. These efforts run contrary to Chaffin’s self-defense argument, and created a jury issue. Bogart v. State, 114 So.3d 316, 318 (Fla. 4th DCA 2013) (facts that defendant moved victim’s body, destroyed evidence, and did not call 911 after killing were contrary to self-defense and suggested that defendant had a guilty conscience).

ii) Sufficiency of the Evidence

Likewise, the evidence presented by the State supported Chaffin’s conviction *613 for second degree murder. Section 782.04(2), Florida Statutes (2009), provides “[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree....” § 782.04(2), Fla. Stat. (2009).
“In the context of second-degree murder, an act is imminently dangerous to another and evinces a ‘depraved mind’ if it is an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another; and (2) is done from ill will, hatred, spite or an evil intent; and (3) is of such a nature that the act itself indicates an indifference to human life.” Wiley v. State, 60 So.3d 588, 591 (Fla. 4th DCA 2011).
As we have explained, “[pjointing a loaded gun at the head of the victim and then firing has frequently been held to be an act ‘imminently dangerous to another and evincing a depraved mind regardless of human life.’ ” Gibbs v. State, 904 So.2d 432, 435 (Fla. 4th DCA 2005) (citing to a line of cases holding the same). Here, Chaffin pointed a loaded gun at his father’s head and fired. Additionally, evidence presented by the State established that Chaffin and his father had a complicated relationship which was fraught with conflict over the grow house. Accordingly, because the State established that Chaffin pulled and fired a gun at his father’s head and that he and his father had a relationship that may have sparked ill will in Chaffin’s mind, there was sufficient evidence to meet the depraved mind element of second degree murder.

b) Motion to Suppress

Chaffin also argues that the trial court erred in denying his motion to suppress because the interviewing detectives improperly minimized the significance of his Miranda rights and did not address his inquiry regarding his right to an attorney. After carefully reviewing the videotape of the interview, we affirm the trial court’s ruling.
“The standard of review applicable to a motion to suppress evidence requires that this Court defer to the trial court’s factual findings but review legal conclusions de novo.” Backus v. State, 864 So.2d 1158, 1159 (Fla. 4th DCA 2003).

i) Minimization of Miranda rights

We agree with Chaffin that the interviewing detectives tried to minimize the significance of his Miranda rights by referring to them as a “formality.” See Ross v. State, 45 So.3d 403, 428 (Fla.2010) (holding that police officer minimized and downplayed the significance of a suspect’s Miranda rights in part because he asserted they were only a matter of procedure). However, this in itself is not dispositive. The key inquiry when reviewing the admissibility of a post-Mirandized statement is whether “the waiver of the Miranda rights was voluntary, knowing, and intelligent and whether the statements made after the waiver were voluntary.” Id. at 418.
In Ross, the Florida Supreme court set forth a comprehensive review of the law surrounding Miranda rights. Id. at 419-24. It explained that not all statements given post -Miranda are voluntary, depending on the circumstances. Id. at 424. One factor which may negate the voluntariness of a statement is if the police downplayed the significance of the Miranda rights. Id. However, this is only a factor if the Miranda rights were tardily administered. Id. at 428 (whether police *614 minimized and downplayed the significance of Miranda rights is factor to be considered “to ensure that a suspect who is provided with a tardy administration of the Miranda warnings truly understands the importance and the effect of the Miranda warnings in light of the problems faced when warnings are delivered midstream.”); see also Ramirez v. State, 739 So.2d 568, 574 (Fla.1999) (when police undertook two part strategy of delaying informing suspect of his Miranda rights and downplaying their significance when they were given, post-Miranda statements were not voluntary).
Here, there was no delay in the administration of Chaffin’s Miranda rights. Further, despite the detective’s comments, the videotape reflects that Chaffin understood and voluntarily waived his rights. He was read his rights in a normal cadence,[2] acknowledged that he understood his rights several times, and appeared to have read over his rights before signing a form acknowledging his waiver. See Sliney v. State, 699 So.2d 662, 668 (Fla.1997) (evidence supported conclusion that defendant voluntarily waived right to remain silent and obtain counsel when officer read defendant his rights and asked defendant whether he understood each of this rights to which defendant responded affirmatively). Thus, we hold that Chaffin voluntarily waived his rights and the trial court correctly denied Chaffin’s motion to suppress on the minimization of Miranda issue.

ii) Inquiry Regarding Right to Counsel

Chaffin also argues that the trial court should have suppressed his statements because he inquired about his right to counsel but was ignored by the detectives. In support of his position, Chaffin relies almost exclusively on Almeida v. State, 737 So.2d 520 (Fla.1999). The facts in Almeida were as follows. The defendant was picked up by police and taken to headquarters where he was immediately read his Miranda rights and signed a waiver form. Id. at 522, 86 S.Ct. 1602. Several minutes later, he spontaneously confessed to committing an unrelated murder. Id. At that point, the interviewing officer commenced a formal recorded session, and after starting the tape, the following discussion transpired:
Q. All right. Prior to us going on this tape here, I read your Miranda rights to you, that is the form that I have here in front of you, is that correct? Did you understand all of these rights that I read to you?
A. Yes.
Q. Do you wish to speak to me now without an attorney present?
A. Well, what good is an attorney going to do?
Q. Okay, well you already spoke to me and you want to speak to me again on tape?
Q. We are, we are just going to talk to you as we talked to you before, that is all.
A. Oh, sure.
Id. (emphasis in original).
In determining whether the defendant was invoking his right to counsel when he asked what good an attorney would do, the supreme court first considered whether the defendant was in fact referring to his right to counsel. It held that he was because the question was posed “(1) at the very beginning of the taped interrogation session; (2) in the midst of a general discussion concerning his rights; and (3) in direct response to a police question con *615 cerning the right to counsel.” Id. at 523-24. It then considered “whether the utterance was a bona fide question which— under the normal circumstances — would call for an answer.” Id. at 524. Examining the recording of the interview, the court held that the defendant’s question was a genuine question as opposed to a rhetorical question. Id. It mainly based its- determination on the manner with which the question was posed: deliberately and with several pauses. Id.
Ultimately, the court reversed, holding “that if, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer- Any statement obtained in violation of this proscription violates the Florida Constitution and cannot be used by the State.” Id. at 525.
Applying the analysis outlined in Almei-da, we hold that Chaffin was certainly referring to his right to counsel when he stated “Uh, basically I have a right to an attorney, right?” However, our review of the videotape leads us to conclude that he was not posing an unequivocal question which required an answer by the detectives. Unlike in Almeida, where the defendant paused and asked what good an attorney could do in a serious, deliberate manner, here Chaffin, in a very casual manner and without the voice inflection usually associated with a question, responded to detectives by reciting what he believed his rights to be. It is clear from the tape that Chaffin was assuring detectives that he understood his rights and was not asking a question he expected to be answered. Accordingly, we affirm on this issue.

c) Tampering With Evidence Conviction

Finally, we turn to Chaffin’s conviction for tampering with evidence. We reverse and remand for a new trial on this charge because the State presented the jury with two separate incidents of tampering in support of one charge.
Directly on point is our opinion in Perley v. State, 947 So.2d 672 (Fla. 4th DCA 2007). There, a defendant was charged with one count of escape via an information that did not include any factual specifics. Id. at 674. At trial, the state presented evidence that the defendant escaped from police custody on two separate occasions and argued, without objection by the defense, that the jury could convict the defendant on the escape count based on either of his escapes. Id. We held that this was fundamental error since it compromised the jury’s ability to render a unanimous verdict, reasoning: “The State’s actions make the unanimity of the jury’s verdict questionable, as some members of the jury could have determined that one incident constituted escape, while others on the jury could have determined that the other incident constituted escape, rather than agreeing unanimously that the same incident constituted escape.” Id. at 674-75.
The record reflects that the State argued to the jury that it could convict Chaf-fin for one charge of tampering based on one of two separate instances of tampering. This is evidenced by the State’s response when the court asked what the tampering with evidence charge went to: concealing the grow house or burying the body. The State responded: “Well, if you look at the Information, there was no motion for statement of particulars, it said destroy a thing or object, so it could be either one.” The State’s explanation to the jury in closing argument was no different, and it specifically referenced the opening of two separate and distinct investigations, one instigated by the girlfriend *616 calling about the grow house and the other to investigate the killing:
Now was there an investigation pending when he buried his dad and destroy (sic) and the marijuana and the grow house and all that stuff? No, not yet. Was it about to be instituted? [His girlfriend] called the cops, right? And when a person murders someone, kills them, whether it’s justifiable or not, guess what’s about to be instituted? An investigation, okay?
Under the guidance of Perley, we hold that the “State’s actions made the unanimity of the jury’s verdict questionable as some members of the jury could have determined” that Chaffin’s role in covering up the grow house constituted tampering while others could have determined that burying his father constituted tampering. Id. at 674-75. Accordingly, we reverse Chaffin’s conviction for tampering and remand for a new trial on that charge.

Affirmed in Part; Reversed in Part and Remanded.

STEVENSON, J., and SINGHAL, RAAG, Associate Judge, concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. See Reed v. State, 96 So.3d 1118 (Fla. 1st DCA 2012). There, Judge Wolf in a concurrence noted that effective Miranda warnings should not be rattled off in a rapid fire manner, but should be communicated at a normal cadence. Id. at 1118.