ORFINGER, J.
Amber Wright appeals her conviction for the first-degree murder of Seath Jack *445 son. Wright contends that law enforcement’s failure to timely provide her the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), tainted her subsequent admissions. We agree, reverse Wright’s conviction, and remand for a new trial.[1]
FACTS
Wright was one of five young people charged with Jackson’s murder. Fifteen-year-old Wright and Jackson had been in a relationship, but broke up acrimoniously. Using text messages, Wright and Charlie Ely lured Jackson to a trailer, where Kyle Hooper, Wright’s brother, along with Michael Bargo, her boyfriend, and Justin Soto, beat and shot Jackson before placing his body in a bag and burning it in a backyard fire pit.[2] The remains were then shoveled into five-gallon paint buckets and thrown in a rock quarry.
Two days after the murder, Mrs. Tracey Wright, Wright and Hooper’s mother, called Sheriffs Deputy David Rasnick, telling him that Hooper knew something about Jackson’s disappearance.[3] When Deputy Rasnick arrived at the Wright residence, Wright, Hooper, Ely, and Mrs. Wright were all present. Because Hooper became emotional, Deputy Rasnick read him the Miranda warnings. Deputy Ras-nick’s supervisor arrived and told him that investigators wanted to interview “the kids” at the station. Deputy Rasnick passed that request on to them, and went next door to find Soto. Deputy Rasnick, Soto, Ely, Wright and Hooper went to the station in Deputy Rasnick’s marked Marion County Sheriffs Office vehicle, while Mrs. Wright followed behind in her own car. Pursuant to the policies of the sheriffs office, Deputy Rasnick collected the cell phones of those who rode in his car. No one was handcuffed or expressed any reluctance about going to the sheriffs office. Instead, the group seemed “nonchalant.” Ely rode in the front, while Hooper, Wright and Soto rode in the back. At the time, Deputy Rasnick regarded Hooper as a “person of interest,” but neither he nor Wright were suspects.
At the sheriffs office, Wright had three videotaped interviews with Detective Rhonda Stroup. The first interview took place in a “soft room.” Wright and her mother sat together on a large couch, while Detective Stroup sat across from them in a chair. The conversation was calm and patient. Detective Stroup’s questions were factual in nature, and did not accuse or confront either Wright or her mother. During this interview, Wright told Detective Stroup that Jackson “just showed up” at the trailer. Wright claimed that Hooper struck the first blow, frightening her and Ely into hiding in *446 Ely’s room until the next morning. When she woke, the house smelled like bleach.
This first interview lasted about twenty minutes, but the video recording continued for an additional hour. During that time, Wright and her mother primarily stayed in the soft room, which was unlocked. While Detective Stroup was out of the room, she was, among other things, interviewing Hooper, who confessed to the murder and implicated the others, including Wright. Detective Stroup then returned for a second interview. This time, Wright was moved to a “hard room,” a more traditional police interrogation room. To this point, Wright had not been given the Miranda warnings.
Detective Stroup began the second interview by accusing Wright of lying and stating that the interview was “where the rubber hits the road.” Detective Stroup informed Wright that Hooper had told her “everything,” and if Wright continued to lie, she would be treated “like a piece of garbage.” Detective Stroup indicated that she wanted “mutual respect” and the truth, and when pressed, Wright replied, “I’m gonna tell you the truth.” Notwithstanding Wright’s professed willingness to be truthful, she continued to dissemble, prompting Detective Stroup to tell Wright that she was “done with being lied to” and that further lies would lead to her walking out, which was “not what you want.” Finally, Wright admitted her involvement in Jackson’s murder, largely as described by Hooper, prompted by Detective Stroup’s questions. At the conclusion of the second interview, Detective Stroup asked Wright to confirm that no one had offered her anything in exchange for her statement, no one had threatened to beat her, she understood her rights, and her statements were free and voluntary. To all of this, Wright responded, “yes ma’am.” Detective Stroup then arrested Wright for murder and handcuffed her.
Shortly after the second interview ended, Detective Stroup realized that no one had Mirandized Wright. As a result, she escorted Wright, in handcuffs, back to the soft room for a third interview. At the start of the third interview, Detective Stroup told Wright that she was giving her “the chance to be the honest one.” Detective Stroup informed Wright that she had not been read her rights, and then presented a Miranda waiver form to Wright, noting, “[T]his is something I have to do, OK?” Detective Stroup read the warnings on the form to Wright, ultimately asking, “Do you understand these rights?” Wright nodded affirmatively. Detective Stroup then asked, “Having these rights in mind, do you want to talk about this? And if [so] put your initials right there.” Wright complied, saying, “Might as well get it all out.” After Wright signed the waiver form, Detective Stroup questioned her calmly, frequently referring to inculpa-tory information gleaned from their just-completed, un-Mirandized second interview. Wright’s answers were consistent with her statements in the second interview. By the time Detective Stroup read Wright her Miranda rights, Wright had been at the sheriffs office for more than six hours.[4]
Wright later moved to suppress all of her statements, arguing that they were the product of custodial interrogations, that she had not been Mirandized before the *447 first or second interview, and that the failure to do so tainted the admissions made in the third interview. While the State agreed to the suppression of the second interview, it argued against suppressing the first or third interviews. The State contended that Miranda warnings were not needed for the first interview as it was not the result of a custodial interrogation. It also argued that the Miranda warnings given prior to the third interview cured any taint from the second, un-Mirandized interrogation. Based on the State’s concession, the trial court agreed to suppress Wright’s second interview. Without elaboration, the court denied suppression of the first and third interviews. Wright was ultimately found guilty of first-degree murder and sentenced to life in prison without possibility of parole. Wright appeals, contending that the admission of her first and third interviews with Detective Stroup violated her constitutional rights against self-incrimination.
ANALYSIS
Our review of a suppression order presents a mixed issue of law and fact, with deference given to findings of fact supported by competent, substantial evidence, while the application of law to the facts is reviewed de novo. State v. Perez, 58 So.3d 309, 311 (Fla. 5th DCA 2011). Here, the trial court made no oral or written findings; rather, it rendered an unela-borated order denying suppression of the first and third statements.
Both the United States and Florida Constitutions provide that a person may not be “compelled” to be a witness against himself or herself in any criminal matter. Amend. V, U.S. Const.; Art. I, § 9, Fla. Const. To protect the right against self-incrimination, the Supreme Court requires that any individual held for custodial interrogation must be clearly informed as to his or her rights, including the “right to remain silent, that any statement he does make may be used as evidence against him, and ... [the] right to the presence of an attorney, either retained or appointed.” Miranda, 384 U.S. at 444, 86 S.Ct. 1602. If the rights specified in Miranda are not respected, then no evidence obtained from the interrogation of a person in “custody or otherwise deprived of his freedom by the authorities in any significant way” may be used against that person. Id. at 478, 86 S.Ct. 1602. A defendant may waive these rights, but the waiver must be made voluntarily, knowingly, and intelligently. Id.
“The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.” Id. at 476, 86 S.Ct. 1602. The prophylactic Miranda warnings “insure that the right against compulsory self-incrimination [is] protected.” Oregon v. Elstad, 470 U.S. 298, 305, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (quoting New York v. Quarles, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (quotations omitted)). Therefore, “unless and until [the Miranda ] warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the defendant].” Miranda, 384 U.S. at 479, 86 S.Ct. 1602. “A Miranda violation does not constitute coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements.” Elstad, 470 U.S. at 307 n. 1, 105 S.Ct. 1285 (emphasis omitted). This presumption is irrebuttable for the purposes of the State’s case in chief. Id. at 307, 105 S.Ct. 1285.
WRIGHT’S FIRST INTERVIEW
The first issue we consider is whether Wright’s initial interrogation by *448 Detective Stroup was custodial. Police are not required to give Miranda warnings to every potential suspect. The warnings apply only to custodial interrogations. Hunter v. State, 8 So.3d 1052, 1063 (Fla.2008); see Miranda, 384 U.S. at 441-42, 86 S.Ct. 1602. Miranda warnings are required at this stage because “interrogation in certain custodial circumstances is inherently coercive and ... statements made under those circumstances are inadmissible unless the suspect is specifically warned of his Miranda rights and freely decides to forgo those rights.” Duckworth v. Eagan, 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (quoting Quarles, 467 U.S. at 654, 104 S.Ct. 2626). For Miranda purposes, custodial interrogation means any “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda, 384 U.S. at 444, 86 S.Ct. 1602.
The Florida Supreme Court has adopted the objective, reasonable-person test to determine if a suspect is in custody and thus entitled to Miranda warnings before questioning. This test requires the court to determine if, under the totality of the circumstances, a reasonable person in the suspect’s position would not feel free to leave or to terminate the encounter with police. See Connor v. State, 803 So.2d 598, 605 (Fla.2001). To make this determination, the court considers: (1) the manner in which police summon the suspect for questioning, (2) the purpose, place, and manner of the interrogation, (3) the extent to which the suspect is confronted with evidence of his or her guilt, and (4) whether the suspect is informed that he or she is free to leave the place of questioning. The interviewee’s age and prior contact with law enforcement and the criminal justice system may also be considered. Ramirez v. State, 739 So.2d 568, 574 (Fla.1999). However, simply being questioned at a police station does not necessarily imply that an individual is in custody. Howes v. Fields, — U.S. —, 132 S.Ct. 1181, 1188, 182 L.Ed.2d 17 (2012) (citing Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)).
We know that Wright was fifteen at the time of the interviews. A deputy, known to her as “Uncle David,” asked her and several others to come to the sheriffs office for an interview. Only one detective was present during the initial interview, which was conducted in the soft room. In that interview, Detective Stroup’s tone was matter-of-fact and she did not accuse Wright of any crime or confront her with any evidence of guilt. Wright’s mother was present for the entire interview. Their path to the room’s door was unimpeded and the room was neither locked nor guarded. Wright was not informed that she was free to leave, but neither was she in handcuffs or otherwise physically restrained. Her mother still had a cell phone. After the interview, Wright was left with her mother for more than an hour, talked on the phone and tried to sleep. The officer monitoring the interviews from another room did not interrupt Wright when she talked on the phone, and volunteered to assist Wright when she left the interview room on her own.
None of these circumstances indicate to us that Wright’s freedom was impeded on a level similar to an arrest. A reasonable person, even a minor, would feel free to leave. Under the totality-of-the-circumstances test described in Connor, we conclude that Wright was not in custody during the first interview and, as a consequence, Miranda warnings were not required. Compare Ramirez, 739 So.2d at 574 (holding that seventeen-year-old with limited criminal experience was in *449 custody when told by police that they had evidence against him, confronted with evidence and statements from others, and questioned by two detectives in small room without being told he was free to go), with Anthony v. State, 108 So.3d 1111, 1117-18 (Fla. 5th DCA 2013) (holding adult woman, handcuffed and then released, in own home and not confronted with evidence of guilt, was not in custody); see also Duddles v. State, 845 So.2d 939, 940 (Fla. 5th DCA 2003).
WRIGHT’S THIRD INTERVIEW
By the start of the third interview, circumstances had changed substantially. Wright had been arrested for murder and handcuffed. The State does not dispute that Wright was in custody at the start of the third interview. At this point, Wright had been at the sheriffs station for roughly six hours. Just fifteen to forty-five minutes earlier, she had been subjected to an un-Mirandized, intense and accusatory interview, during which she confessed. Cf. Ramirez, 739 So.2d at 574. Though Detective Stroup read Wright the Miranda warnings before starting the third interview and Wright agreed to waive those rights, Wright contends that her waiver was ineffective and tainted by her earlier, un-Mirandized confession.
In Ross v. State, 45 So.3d 403 (Fla.2010), the Florida Supreme Court reviewed the law governing the effectiveness of “midstream” Miranda warnings, meaning those delayed until after the start of questioning. Ross reiterated the long-standing rule that places a “heavy burden” on the State to show that an interviewee who confesses after Miranda warnings were given waived his or her rights knowingly and intelligently. 45 So.3d at 418. Normally, this happens at the start of an interrogation. The court observed that Miranda warnings are not always sufficient when their administration is delayed until well into an interrogation. Id. at 418-19. The court concluded that
[t]he analysis of the admissibility of statements made following a custodial interrogation and after the delayed administration of Miranda warnings is based on the totality of the circumstances, with the following being factors important in making this determination:
(1) whether the police used improper and deliberate tactics in delaying the administration of the Miranda warnings in order to obtain the initial statement;
(2) whether the police minimized and downplayed the significance of the Miranda rights once they were given; and
(3) the circumstances surrounding both the warned and unwarned statements including “the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second [interrogations], the continuity of police personnel, and the degree to which the interrogator’s questions treated the second round as continuous with the first.” In addition, there are other circumstances to consider on a case-by-case basis, such as the suspect’s age, experience, intelligence, and language proficiency.
Id. at 424.
In applying the Ross factors, Wright does not argue that the delay was intentional. Nor do we find the second Ross factor, downplaying or minimizing the Miranda warnings, present here. While Detective Stroup said, “This is something I have to do” when giving the Miranda warnings, this is an accurate statement of the law, as law enforcement officers are required to administer Miranda warnings prior to custodial interrogations. Miranda, 384 U.S. at 478-79, 86 S.Ct. 1602. *450 Although similar to a comment highlighted in Ross, 45 So.3d at 428 (noting “I got to read this to you,” as part of discussion downplaying Miranda rights), it was not accompanied by any other commentary on the evidence or the outcome of prosecution. While reading the Miranda warnings, Detective Stroup did not allude to the previous interview, except to draw attention to her earlier mistaken belief that she had given the warnings. Detective Stroup read the rights at a moderate pace from a printed form, pointing out each right as she went. See Chaffin v. State, 121 So.3d 608, 614 n. 2 (Fla. 4th DCA 2013) (noting effective Miranda warnings should be read “at a normal cadence” (citing Reed v. State, 96 So.3d 1118, 1118 (Fla. 1st DCA 2012))). Detective Stoup asked if Wright understood the rights, and Wright nodded affirmatively. Detective Stroup ended the warnings by asking Wright, “Having these rights in mind, do you want to talk about this?” There does not appear to be any derision or dismissiveness in these acts. Nothing in the record indicates that Detective Stroup downplayed or minimized the significance or power of the Miranda warnings.
However, Ross also requires us to examine the other circumstances around the warned and unwarned statements. Specifically, we look.at whether the two statements were made under circumstances sufficiently similar to indicate that the interrogation was, in actuality, one “integrated and proximately conducted questioning” and not two separate events. 45 So.3d at 432.[5] Here, much like the two rounds of questioning in Ross, all the interviews were conducted in the same building, by the same officer within a short span of time, and covered almost exactly the same information. After receiving her waiver, Detective Stroup referred repeatedly to Wright’s earlier statements, and urged her to reiterate her earlier statements and clarify inconsistencies in the earlier interviews. The only difference was the manner of questioning: intense, accusatory and confrontational in the second interview, but calm and patient in the third. The second and third interviews were separated by at most forty-five minutes (and perhaps as little as fifteen minutes), during which time Wright was arrested and handcuffed. Thus, we conclude that the second and third interviews constituted one “integrated and proximately conducted questioning,” and not separate events as the State asserts. See Ross, 45 So.3d at 432.
Finally, we consider Wright’s age, experience with the criminal justice system, intelligence and, perhaps most significantly, whether the police did anything to counter Wright’s probable misimpression that her earlier, un-Mirandized statements could be used against her. The fifteen-year-old Wright had only one prior encounter with law enforcement, though she could not recall being Mirandized. This weighs against her understanding the significance of her Miranda rights. See Ramirez, 739 So.2d at 583 (four justices concurring). Wright earned mostly As and Bs in jail school, but this sheds no light on her understanding of her constitutional rights. Wright was not an individual who the case law would presume to be resilient to aggressive questioning. See id. at 586; see also J.D.B. v. North Carolina, — U.S. —, 131 S.Ct. 2394, 2404-05, 180 L.Ed.2d 310 (2011) (noting minors fundamentally different for certain Miranda purposes). Though Wright did say that she “might as well get it all out there” when signing her *451 waiver, this appears simply to reflect resignation to her inevitable prosecution, given that she had just incriminated herself minutes earlier. Finally, law enforcement did nothing to counter Wright’s probable and reasonable belief that her prior incriminating statement, made just minutes before, could be used against her.
In sum, the failure to Mirandize Wright appears to have been an honest mistake; however, the warnings, when given, were delivered in the middle of a single, protracted round of custodial interrogation of an inexperienced minor. We find that the State failed to show a knowing, intelligent and voluntary waiver of Wright’s Miranda rights. Ramirez, 739 So.2d at 575. As a result, we conclude that the trial court erred when it admitted Wright’s third interview into evidence. Compare Elstad, 470 U.S. at 315-16, 318, 105 S.Ct. 1285 (holding suspect who has once responded to unwarned yet uncoer-cive questioning is not thereby disabled from waiving Miranda rights if warned, and if second statement was “also voluntarily” made, and holding that individual, questioned briefly at home near mother, though already in custody, could voluntarily later waive Miranda at police station), with Missouri v. Seibert, 542 U.S. 600, 614-17, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality of justices holding that Elstad does not apply if first interview had “earmarks of coercion,” and that deliberate plan to undermine Miranda rights rendered post-warning statements inadmissible), id. at 621-22, 124 S.Ct. 2601 (Kennedy, J., concurring) (regarding Elstad as continuing to apply, unless deliberate attempt to undermine Miranda), and Ross, 45 So.3d at 433-34 (concluding twenty-one-year-old’s post-warning statements inadmissible where police deliberately delayed and downplayed significance of rights, reminded defendant of admissions, and did not counter misimpression that pre-warn-ing statements could be used against him, and where two rounds of questioning had only “minimal” break between them, with no change in circumstances). See Davis v. State, 859 So.2d 465, 471-72 (Fla.2003) (holding that midstream Miranda warnings to nineteen-year-old, following brief initial questioning with no indication of concerted effort to undermine Miranda, “cured” constitutional concerns, such that post-warning statements were admissible) (“Davis I”); see also J.D.B., 131 S.Ct. at 2404-05 (noting minors fundamentally different for Miranda purposes, at least in determining custody); Davis v. State, 990 So.2d 459, 465-66 (Fla.2008) (affirming on postconviction appeal rationale of Davis I as unchanged by Seibert); see generally Ross, 45 So.3d at 427 n. 22 (summarizing holdings of and confusion among other state supreme courts regarding mid-interrogation Miranda warnings).[6]
HARMLESS ERROR ANALYSIS
The erroneous admission of statements obtained in violation of Miranda is subject to a harmless error analysis. Ross, 45 So.3d at 434 (citing Mansfield v. State, 758 So.2d 636, 644 (Fla.2000)). The test for harmless error
*452 places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.
Id. (quoting State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986)). The erroneous admission of a confession is harmful when the state relies on and repeatedly emphasizes the statement in closing argument and the defense attempts to show the statement was coerced, id. at 434-35, the confession is “by far” the most damaging evidence presented at trial, Horne v. State, 127 So.3d 898, 905 (Fla. 5th DCA 2013), the confession presents the whole picture of the crime and is “highly inculpatory and prejudicial,” Deviney v. State, 112 So.3d 57, 79 (Fla.2013), or the confession is the only direct evidence that the defendant was the perpetrator, Gilbert v. State, 104 So.3d 1123, 1126 (Fla. 4th DCA 2012).
In the instant case, the State extensively relied on the statements Wright made during the third interview, and Wright responded by arguing that the confession was coerced. The jury never heard that Wright had confessed just minutes before without the benefit of Miranda warnings. The statement directly tied Wright to the crime, and presented a complete picture of her complicity. It was highly inculpatory, showing Wright’s involvement from the initial planning of Jackson’s murder, to the disposal of his body. It was also highly prejudicial, as Wright showed no remorse or sympathy for Jackson, instead expressing distress that her boyfriend, co-defendant Bargo, had abandoned her. Under these circumstances, the State cannot show that the error was harmless. Thus, Wright’s conviction for first-degree murder must be reversed and a new trial must be conducted without introducing Wright’s third statement.
REVERSED and REMANDED for a new trial.
TORPY, C.J. and EVANDER, J.,[7] concur.

. We reject without comment Wright’s challenge to the number of jurors in her case. Additionally, Wright’s challenge to her sentence is moot in light of our opinion requiring a new trial.

. The other four participants have all been convicted of Jackson’s murder. This Court recently affirmed Hooper’s conviction for first-degree murder, but remanded for resentencing. Hooper v. State, No. 5D12-3466, — So.3d —, 2014 WL 2217333 (Fla. 5th DCA May 30, 2014). Bargo, who was eighteen at the time of the murder, was convicted of first-degree murder and sentenced to death. His appeal is currently pending in the Florida Supreme Court. Bargo v. State, No. SC14-125 (Fla. appeal docketed Jan. 24, 2014). This Court affirmed Ely’s first-degree murder conviction and life sentence. Ely v. State, 116 So.3d 1275 (Fla. 5th DCA 2013). Soto was also convicted of first-degree murder but did not appeal.

.Mrs. Wright is Deputy Rasnick's wife's ex-husband’s sister. Wright knew him as "Uncle David.”

. The timing of the interviews is not clear from the record. Somewhere between fifteen and forty-five minutes elapsed between the end of the second interview and the start of the third. The time stamps in the DVD recordings in the record do not match the testimony at the hearing or the time noted on Wright's written Miranda waiver. The trial court made no factual findings to clear up this conflict.

. Here, we focus only on the second and third statements as no Miranda warnings were required for the first, non-custodial interview.

. The State argues Wright’s written waiver is dispositive evidence that her statements in the third interview were voluntary. However, written waivers are only dispositive in the absence of other factors or circumstances. See United States v. Johnson, 426 F.2d 1112, 1115 (7th Cir.1970). There were other factors present, as discussed above. Though the court in Ramirez did note that a waiver's written transmission is a factor to be considered, it is just one part of the totality of the circumstances. 739 So.2d at 578 (citing Sliney v. State, 699 So.2d 662, 669 n. 10 (Fla.1997); Traylor v. State, 596 So.2d 957, 966 (Fla.1992)).