NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

STATE OF FLORIDA,                              )
                                               )
                    Appellant,                 )
                                               )
v.                                             )          Case No.  2D14-2988
                                               )
QUANYISHA THOMPSON,                            )
                                               )
                    Appellee.                  )
_____    )

Opinion filed March 4, 2016.

Appeal from the Circuit Court for
Hillsborough County; Chet A. Tharpe,
Judge.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Marilyn Muir Beccue,
Assistant Attorney General, Tampa, for
Appellant.

Howard L. Dimmig, II, Public Defender, and
Amanda V. Isaacs, Assistant Public
Defender, Bartow, for Appellee.


LaROSE, Judge.

          The State appeals an order suppressing Quanyisha Thompson's

statements that led to charges of first-degree felony murder and aggravated child

abuse.  After the unexplained death of Ms. Thompson's infant, a Tampa Police

Department detective interviewed her on several occasions.  The detective recorded

each interview.  Ms. Thompson eventually confessed to punching the child.  She was arrested some weeks later.  Ms. Thompson successfully moved to suppress the incriminating statements she made to the detective in her last interview.  Ms. Thompson argues that the detective failed to give her timely Miranda[1] warnings.

We have jurisdiction.  See Fla. R. App. P. 9.140(c)(1)(B).  Because Ms. Thompson was not in custody and under interrogation during any of her interviews with the detective, the trial court erred in suppressing her statements.  Accordingly, we reverse.

The State charged Ms. Thompson with one count of felony murder and one count of aggravated child abuse.  See §§ 782.04(1)(a)(2)(h), 827.03(1)(a)(3), 2(a), Fla. Stat. (2013).  Detective Kirlangitis first encountered Ms. Thompson at the hospital where her injured infant eventually died.  The detective spoke individually with Ms. Thompson, her boyfriend, and the child's father.  Unfortunately, he learned little about the cause of death.  A subsequent autopsy, however, revealed that the infant suffered blunt force trauma to the abdomen, leading to a mesentery[2] tear that caused his death. The infant also suffered seven broken ribs prior to death.

Detective Kirlangitis interviewed Ms. Thompson, again, at her grandmother's home.  During this second interview, the detective began by asking, "Do you want to talk to me?"  Ms. Thompson responded, "Yes."  As the interview continued, Detective Kirlangitis reminded her that she was not in handcuffs and was not in "any

_____

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

[2]Mesentery is a membrane that encloses the intestines and connects them to the back wall of the abdominal cavity.  Mesentery, Merriam-Webster, http://www.merriam-webster.com/dictionary/mesentery (last visited Dec. 11, 2015).

trouble." He told her she could terminate the interview. Ms. Thompson continued to answer his questions, all the while walking around the home, crying, and talking with family members. The interview ended when officials from the Department of Children and Families arrived to investigate three surviving children and an unborn child; Ms. Thompson was pregnant at the time.

The detective then interviewed Ms. Thompson once a day for three days at the police station. For each of these three interviews, Ms. Thompson came voluntarily to the police station, accompanied by her mother. During each interview, Detective Kirlangitis informed Ms. Thompson that she was free to end the conversation. She was not detained or restrained. She left on her own at the end of each police station interview.

During the fifth and final interview, Ms. Thompson admitted to punching the infant. Detective Kirlangitis then read her Miranda rights and asked her to recount the incriminating information. Ms. Thompson's mother announced that she would seek counsel. Ms. Thompson and her mother ended the conversation and left the police station. About one month later, the police arrested Ms. Thompson.

Ms. Thompson moved to suppress the incriminating pre-Miranda statements made at the final interview. The trial court granted the motion, effectively leaving a gap in the State's ability to establish the events leading to the infant's death. On appeal, the State contends that Ms. Thompson was not entitled to Miranda warnings earlier because throughout the interviews she was not "in custody and under interrogation." We agree.

## Sufficiency of the Record

Ms. Thompson argues that the record is inadequate to demonstrate reversible error. She contends that the State failed to transcribe the CD of her interviews. It is clear, however, that the CD was before the trial court. Indeed, the parties recognized the need for the trial court to listen to the CD. The CD is in our record and we have listened to it.

Video and audio recordings can be properly "part of the record" sufficient for appellate review without transcripts of their contents. See Schwab v. State, 814 So. 2d 402, 411 (Fla. 2002) ("These videotapes were properly introduced into evidence at trial and are a part of this record. Schwab has failed to demonstrate how he was prejudiced by not having the transcripts of these videotapes in the record.").

An appellate court may independently review the audio recording of an interview to assess whether competent, substantial evidence supports the trial court's findings. Cuervo v. State, 967 So. 2d 155, 160 (Fla. 2007); see also Almeida v. State, 737 So. 2d 520, 524 n.9 (Fla. 1999) (recognizing that insofar as a ruling is based on a videotape or audiotape, the trial court is in no better position to evaluate such evidence than the appellate court).

## Miranda Warnings

Law enforcement officers must Mirandize an individual who is "in custody *and* under interrogation." Davis v. State, 698 So. 2d 1182, 1188 (Fla. 1997). "Absent one or the other, Miranda warnings are not required." Id. Miranda warnings are not required for every potential suspect. Wright v. State, 161 So. 3d 442, 448 (Fla. 5th DCA 2014). "The warnings apply only to custodial interrogations." Id.

Custody, for purposes of Miranda, includes a "formal arrest" or "any restraint on freedom of movement [to] the degree associated with formal arrest." Ramirez v. State, 739 So. 2d 568, 573 (Fla. 1999). The "unarticulated plan of the police is not the [focus of the inquiry], but rather [the focus is] how a reasonable person in the suspect's position would have perceived the situation." Davis, 698 So. 2d at 1188; see also Wright, 161 So. 3d at 448 ("The Florida Supreme Court has adopted the objective, reasonable-person test to determine if a suspect is in custody and thus entitled to Miranda."). Importantly, "Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' " California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

The supreme court has established four nonexclusive factors that we consider in evaluating whether a reasonable person in the suspect's position would consider herself in custody and, thus, entitled to Miranda warnings: (1) the manner in which the police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of her guilt; and (4) whether the suspect is informed that she is free to leave. Ramirez, 739 So. 2d at 574. Ultimately, the inquiry is whether, under a totality of the circumstances, "a reasonable person in the suspect's position would feel a restraint of his or her freedom of movement, fairly characterized, so that the suspect would not feel free to leave or to terminate the encounter with police." Ross v. State, 45 So. 3d 403, 415 (Fla. 2010) (quoting Connor v. State, 803 So. 2d 598, 605 (Fla. 2001)).

### (1) Manner in which the police summoned the suspect for questioning

Detective Kirlangitis interviewed Ms. Thompson five times. She and the detective first met at the hospital on the day of the infant's death. The second interview occurred at Ms. Thompson's grandmother's home the next day. On each of the next three days, Ms. Thompson's mother brought her to the police station for further interviews. Ms. Thompson came voluntarily. She was not brought to the station by police. The fifth interview took place after Ms. Thompson's dependency hearing, which took place near the police station. At this last interview, she admitted that "[she] wanted to come down here." A few minutes later, she confirmed her desire to speak with the detective. Nothing in our record indicates that every encounter between Ms. Thompson and the detective was anything but her voluntary undertaking. The detective did not coerce, cajole, entice, or summon Ms. Thompson to engage in the interviews.

### (2) The purpose, place, and manner of the interrogation

The fifth interview occurred in an eighth floor conference room at the police station. Mere questioning at the police station does not establish custody. The U.S. Supreme Court recognizes that questioning at a police station, standing alone, is not indicative of custody. Beheler, 463 U.S. at 1125. We cannot ignore, however, that "a defendant's presence in a station while subjected to questioning undoubtedly can have a bearing on how a reasonable person in the defendant's situation views [her] status." State v. Pitts, 936 So. 2d 1111, 1126 (Fla. 2d DCA 2006). We must observe that although this was Ms. Thompson's fifth interview, and the third at the police station, her mother was present and was not asked to leave. Ms. Thompson was unrestrained; she was able to leave at the end of the session, even after making incriminating

statements.  The tone and content of the conversation suggest nothing coercive or confining about the location of the last interview.

Evidently, Detective Kirlangitis viewed Ms. Thompson as a potential suspect.  He testified that he "needed to clear up exactly how hard she punched [the infant], where she punched [the infant] and if [he] believed the description of her punch was actually the blow that caused the death."  Nevertheless, Ms. Thompson voluntarily came to the police station to tell the truth about what happened to her infant.  We are hard pressed to see that a custodial interrogation ensued.  Even if the detective suspected that Ms. Thompson injured her infant, law enforcement suspicion, by itself, does not turn a consensual encounter into a custodial interrogation.  See Beheler, 463 U.S. at 1125 (citing Mathiason, 429 U.S. at 495).

<u>Investigatory to Accusatory</u>

An interrogation can turn from noncustodial into custodial as it progresses. Pierre v. State, 22 So. 3d 759, 766-71 (Fla. 4th DCA 2009).  The "very practical recognition that '[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime' " must be considered.  Beheler, 463 U.S. at 1124 (quoting Mathiason, 429 U.S. at 495).  But a custodial interrogation is not triggered just because an officer asks the suspect about criminal behavior.  See id. at 1123-24 (holding that Miranda warnings are required only where a person's freedom has been so restricted as to render the person "in custody").

In State v. Scott, 786 So. 2d 606 (Fla. 5th DCA 2001), for example, the court held that "police questioning about the suspect's criminal conduct or activity

alone . . . does not convert an otherwise consensual encounter into a custodial interrogation for Miranda purposes. Id. at 610 (quoting Ramsey v. State, 731 So. 2d 79, 81 (Fla. 3d DCA 1999)). The Fifth District concluded that Scott was not in custody when he made incriminating statements about the theft of a wallet and credit card. Scott, 786 So. 2d at 607, 610. Although the officer did not tell Scott she was free to leave, nothing indicated that the officer coerced, threatened, intimidated, or touched her during the interview. Id. at 607. The interview took place in a normal conversational tone. Id. Scott was not arrested that day. Id. These facts are substantially similar to those before us. Significantly, in each of her five encounters with the detective, Ms. Thompson exercised her right to end the conversation and leave. Even after Ms. Thompson admitted to striking her infant, she was not arrested.

Similarly, in Beheler, the defendant voluntarily appeared at the police station, was permitted to return to his home, and was not arrested until days later. Beheler, 463 U.S. at 1122. Police read Beheler his Miranda rights at the time of his arrest. Beheler, 463 U.S. at 1122. The Supreme Court held that he was not previously in custody for Miranda purposes. Beheler, 463 U.S. at 1125. And the case before us does not present a situation like Mansfield v. State, 758 So. 2d 636 (Fla. 2000), where police never told the suspect that he was free to leave the police station, confronted him with strong evidence of his guilt, and engaged in accusatory questioning that made clear that the defendant was considered the prime suspect. In Mansfield, the defendant was in custody. Id. at 644.

Nor is our case like Pierre. There, the Fourth District, after listening to interview tape, held that the tone of the detective's voice during questioning evoked a response that violated Miranda. Pierre, 22 So. 3d at 771. And, in Ross, although the

- 8 -

defendant voluntarily went to the sheriff's office, the interrogation soon became accusatory after the officers confronted the defendant with bloody pants that strongly implicated his guilt. Ross, 45 So. 3d at 410, 415-16. The interrogation lasted several hours and took place in a small room. Id. at 409-10. The defendant was told that he was not under arrest. Id. at 417. The supreme court held that the officers should have provided Miranda warnings to Ross "before the interrogation turned accusatorial and the officers confronted Ross with the bloody pants." Ross, 45 So. 3d at 418.

Ms. Thompson's interview occurred in a larger conference room with her mother present. The detective confronted her only with evidence that homicide was the manner of death, and the fact that a handprint on the infant's body could not be that of her boyfriend. The detective confronted her with no evidence directly connecting her to the fatal blow. Only after Ms. Thompson admitted to striking her infant did the detective pose more probing questions.

### (3) The extent to which the suspect is confronted with evidence of his or her guilt

The evidence Detective Kirlangitis revealed to Ms. Thompson reflected facts known to him at the time regarding the infant's injuries and the manner of death.

In State v. Pitts, we recognized:

> Although not necessarily dispositive, "the extent to which the suspect is confronted with evidence of his or her guilt" can be a circumstance that weighs heavily in the balances. A reasonable person in the situation of a suspect who has been "confronted with evidence strongly suggesting his guilt" may well understand that such evidence means that the police will not allow the suspect to go on his way. Mansfield, 758 So. 2d at 644. A reasonable person understands that the police ordinarily will not set free a suspect when there is evidence "strongly suggesting" that the person is guilty of a serious crime.

936 So. 2d at 1127-28.

The primary concern with a suspect being confronted with evidence of his or her guilt is that it generally leads a person to believe they are no longer free to go because law enforcement is unlikely to release a person who is suspected of committing a serious crime. Pitts, 936 So. 2d at 1127-28. When police confront the defendant with evidence that strongly suggests her guilt, the significant psychological impact on the defendant will diminish if the police do nothing to refute the defendant's explanation. Meredith v. State, 964 So. 2d 247, 252 (Fla. 4th DCA 2007) (holding defendant not in custody where, even though police presented defendant with voluminous evidence implicating him in the crime, the impact of the evidence was lessened because they never indicated that they did not believe his explanation). Simply confronting a person with incriminating evidence of guilt does not by itself make for a custodial interrogation. State v. Rodriguez, 785 So. 2d 759, 761 (Fla. 3d DCA 2001); Pitts, 936 So. 2d at 1128.

Rather, "[t]he significance of this factor turns on the strength of the evidence as understood by a reasonable person in the suspect's position as well as the nature of the offense." Pitts, 936 So. 2d at 1128. By the time of the last interview, there seems to be no question that Ms. Thompson, independent of any information she obtained from the detective, knew the extent of the infant's injuries and cause of death before coming to the police station. The detective confronted her with nothing she did not already know. Further, while being questioned about the infant's broken ribs, Ms. Thompson spontaneously confessed to striking the child in the abdomen. Detective Kirlangitis showed her photographic evidence of the child's abdominal injuries only after she admitted the blow.

- 10 -

### (4) Whether the suspect is informed that she is free to leave the place of questioning

Ms. Thompson's mother attended the fifth interview, freely entering and exiting the room throughout. About thirty minutes into the interview, Ms. Thompson freely stood and walked around the room. Detective Kirlangitis did not instruct her to sit or remain in the room. Later, her mother asked what would happen next because Ms. Thompson had made incriminating statements. Detective Kirlangitis told both Ms. Thompson and her mother that he would have to get the results from the medical doctors and child abuse experts and photos of Ms. Thompson's other children, who had whip marks on them. Then he would talk to the State Attorney and "see what they want to do." He then pointed out that Ms. Thompson was not in handcuffs and confirmed that "she said she wanted to come down here." Ms. Thompson responded, "I did." Detective Kirlangitis then reminded her that she could leave at any time.

The interview continued for approximately another eleven minutes during which time Ms. Thompson admitted more incriminating details. Detective Kirlangitis read Ms. Thompson her <u>Miranda</u> rights and attempted to get more information. Ms. Thompson admitted she came to the police station voluntarily and knew she could leave at any time. When asked if she wanted to continue speaking with Detective Kirlangitis, she responded, "I don't care no more." Her mother then asked the detective about a possible arrest. He affirmed that no arrest would take place that day. Ms. Thompson ended the interview and left. This was, of course, consistent with the course of the other interviews at the police station. During the final interview, the detective observed that Ms. Thompson was never handcuffed and was free to leave.

- 11 -

Florida courts have held that Miranda warnings were not needed in far more coercive situations. In Hunter v. State, 8 So. 3d 1052 (Fla. 2008), law enforcement officers ordered Hunter out of his house. They made him place his hands on his head and sit on the sidewalk while police cleared the house. Id. at 1062. Subsequently, Hunter agreed to voluntarily go to the police station for an interview. Id. Law enforcement officers drove him to the station in an unmarked police vehicle accompanied in the back seat by an officer with a gun. Id. Hunter was told he did not have to go to the station, that he was not under arrest, and that he was free to leave at any time. Id. Employing the Ramirez factors, the court held that Hunter was not in custody for Miranda purposes during the interview. Hunter, 8 So. 3d at 1063-64.

Ms. Thompson's situation is not even akin to State v. E.W., 82 So. 3d 150 (Fla. 4th DCA 2012). There, the police contacted the juvenile's mother and informed her that E.W. could be arrested if he did not come to the station for a police interview. Id. at 151. E.W.'s mother took him to the station where detectives advised him that he was not under arrest and was free to leave at any point. Id. at 152. During the interview, the detectives used false evidence to confront E.W. Id. He confessed to the crime, yet no arrest was made that day. Id. at 151. The court held that under the totality of the circumstances, E.W. voluntarily appeared at the police station, police informed him that he was free to go, and the encounter was consensual. Id. at 152.

Ms. Thompson had the benefit of meeting with Detective Kirlangitis over numerous days where he continually told her that she was not under arrest, was free to leave, and could stop the interviews. He always allowed her to be with her family members during questioning and to leave at the conclusion of each interview. Unlike

E.W., there was no threat that compelled Ms. Thompson to come to the police station. As she repeatedly told the detectives, she wanted to come to tell the truth.

Based on our review of the record, a considered analysis of the Ramirez factors, and the pertinent case law, we must conclude that the trial court erred in suppressing Ms. Thompson's incriminating statement from the fifth interview. We reverse the trial court's order granting the motion to suppress.

Reversed.


BLACK, J., Concurs.
KHOUZAM, J., Concurs specially.



KHOUZAM, Judge, Specially concurring.

I concur in the majority's opinion but write separately to note that I am concerned by the extremely accusatory character of the detective's interview with Thompson, as revealed by the CD recording. In my view, the detective's heavy-handed tactics and harsh tone were so egregious that they alone nearly transformed the consensual interview into a custodial interrogation for purposes of Miranda. Indeed, considering these facts, I understand why the trial court in this case believed that suppression was appropriate. However, I acknowledge that the accusatory nature of the interrogation is only one of the factors to be considered and we are constrained to reverse based on the clear precedent delineated by the majority.